NEW CASTLE COUNTY, Plaintiff,

v.

CONTINENTAL CASUALTY
COMPANY (CNA),
Defendant.

Civ. A. No. 85–436–JLL.

United States District Court,
D. Delaware.

Oct. 23, 1989.

George H. Seitz III of Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Del., Joseph A. Tydings and Catherine Serafin Sponseller of Anderson, Kill, Olick & Oshinsky, Washington, D.C., of counsel, for plaintiff.

John G. Mulford and Michael J. Goodrick of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Del., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

### I. INTRODUCTION

This case arises out of comprehensive general liability insurance policies issued by twelve insurance companies. The policies covered two waste disposal landfills operated by New Castle County ("County"): Llangollen[1] and Tybouts Corner. The County brought this action for a declaratory judgment seeking a declaration that the insurance companies must defend and indemnify the County for claims arising from pollution leaching from the two landfills. Prior to trial, eleven insurance companies settled in a manner not reflected in the record.[2] The settlements left the Continental Casualty Company ("CNA") to defend the four policies implicated in this litigation. The sole issue before the Court is whether CNA must cover[3] the County for claims brought for damages caused by the Tybouts Corner operation. Jurisdiction is based on 28 U.S.C. § 1332.

Two prior opinions of this Court decided issues raised by the insurance companies'

---

**1.** Llangollen is also known as the Army Creek landfill.

**2.** The insurers that settled are: U.S. Fire Insurance Company, U.S. Liability Insurance Company, Aetna Casualty & Surety Company, Hartford Accident & Indemnity Company, Twin City Fire Insurance Company, Home Insurance Company, Insurance Company of North America, National Union Fire Insurance Company, Continental Insurance Company, Zurich Insurance Company, and New Hampshire Insurance Company.

**3.** CNA's duties under the policies will be referred to collectively throughout this opinion as "coverages." If a particular discussion refers only to either the duty to indemnify or the duty to defend, the opinion will so indicate.

motions for summary judgment. *See New Castle County v. Hartford Accident & Indemnity Co.,* 673 F.Supp. 1359 (D.Del. 1987) ("*New Castle I* "); *New Castle County v. Hartford Accident & Indemnity Co.,* 685 F.Supp. 1321 (D.Del.1988) ("*New Castle II* "). *New Castle I* denied the insurers' motion concerning the policies' pollution exclusion clauses, and the scope of the term "damages." This Court held that the term "sudden" in the pollution exclusion clause means an unexpected discharge or dispersal of pollutants. *See New Castle I,* 673 F.Supp. at 1364. Additionally, the term "damages" was held to encompass liability imposed on the County at both law and equity. *See id.* at 1365–66. Regarding CNA, *New Castle II* granted partial summary judgment for claims emanating from the Llangollen landfill, but denied CNA's motion on the issues of "notice" and "occurrence." CNA has subsequently abandoned the notice issue. *See* Docket Item ["D.I."] 519 at 1. Material issues of fact were found to be in dispute concerning the issue of occurrence. Specifically, the parties contested whether and when the pollution was "expected." *See New Castle II,* 685 F.Supp. at 1334.

This matter was tried before the Court without a jury on June 5–8, and 12–14, 1989. After considering all of the testimony, exhibits, and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. FACTS

The current dispute between the County and CNA is centered on the Tybouts Corner landfill ("Tybouts"). The Llangollen landfill neared capacity in 1968. After visiting out-of-state landfills and waste disposal sites, and meeting with state agencies, the County concluded that a sanitary landfill would best meet waste disposal needs once Llangollen reached capacity. County officials then investigated a number of locations in the County, including the Petrillo and Glasgow sites, and the Winchester property, *see* D.I. 511 at 96–98, to determine their suitability as a landfill site. *See* D.I. 503 at 3.2–3.3. Tybouts Corner was chosen. *See* D.I. 503 at 3.2–3.3.

William and Elizabeth Ward owned the Tybouts Corner property. The property was desirable because it was close to the population center of the County. County officials thought the location was accessible, had a good potential for land reclamation, and was large enough to accommodate a number of years of use. Further, Mr. Ward operated a sand and gravel business at Tybouts Corner. Mr. Ward's operation could provide cover material and equipment for the landfill operation. Finally, County officials predicted that the operation of a landfill at the location would have minimal environmental impact. *See id.* at 3.3–3.4.

As a prerequisite to operating, the State of Delaware required the County to comply with the permit requirements of the State Board of Health and the Water and Air Resources Commission ("WARC"), and with State Board of Health Regulations. However, what is known about the environmental impact of landfills now, and what was known in 1968, are worlds apart. *See* D.I. 511 at 32 (testimony of Varrin). In 1968, only one study existed concerning landfill leachate.[4] No mathematical models of leachate creation or migration existed, and no technology for leachate control had been developed. *See* D.I. 515 at 61–62 (cross-examination of Westerman). Scientists did not start to understand the threat posed by leachate until the early 1970's. *See* D.I. 513C at 74 (testimony of Leis). The paucity of available data at that time is reflected in the fact that prior to 1974 no research had been done in the eastern United States that indicated landfills above the water table would contaminate underlying aquifers. *See* D.I. 513D at 4 (testimony of Apgar).

4. Leachate is "[a]n aqueous liquid that contains soluble or suspended matter acquired as the water percolates through solid waste, soil, underlying mineral strata, or other materials." 2 *International Dictionary of Medicine and Biology* 1553 (1986).

When the County proposed to construct a landfill at Tybouts Corner, Public Health Service, U.S. Dept. of Health, Education and Welfare, Pub. No. 1792, *Sanitary Landfill Facts* (1968) (Plaintiff's Exhibit ["PX"] 6), represented the state of the art. *See* D.I. 511 at 101 (testimony of Karins). This document devotes one paragraph to the problem of water pollution. *See* PX 6 at 14. The issue of drainage is discussed in a different section of the publication, and is deemed important because it will "prevent runoff water from eroding the cover material and exposing the wastes." *Id.* at 13. Potential pollution is not discussed under "Drainage."

Although officials had some idea that waste should be kept above the seasonal high water mark, *see* D.I. 513D at 34 (cross-examination of Apgar), knowledge of leachate formation was not widespread in 1968–69. *See* D.I. 515 at 38 (testimony of Westerman) ("It is a fair statement that maybe they didn't know [of leachate].")。 The 1969 regulations did not address leachate, *see* D.I. 515 at 22–23 (testimony of Westerman), and professionals believed that landfills purified themselves through a process of soil filtration. *See* D.I. 513C at 77 (testimony of Leis). The Court concludes that leachate migration at Tybouts was not understood by either landfill operators or insurance companies in 1968. *See* D.I. 514 at 19–20 (testimony of Jordan).

The primary concern with regard to landfill hazards was direct-contact environmental problems. *See* D.I. 513C at 77 (testimony of Leis). These consisted of vectors, such as rodents and seagulls, blowing paper, odors, and keeping the waste covered. *See* D.I. 515 at 10 (testimony of Vasuki); D.I. 511 at 98–99 (testimony of Karins); *id.* at 105 (same). At that time the State of Pennsylvania had the same primary concerns. *See* D.I. 513C at 50 (testimony of Leis). In the late 1960's, officials were anxious to address public health nuisances, *see* D.I. 515 at 10 (testimony of Vasuki), but were unaware of the potential impact on the environment. *See* D.I. 513C at 77 (testimony of Leis).

Officials were similarly unsophisticated in their approach to hazardous wastes. Standards for industrial waste did not exist in the late sixties. Many substances now prohibited were acceptable at landfills. *See* D.I. 515 at 20 (testimony of Vasuki). The effects of industrial wastes on the environment were largely unknown. *See* PX 83 (January 23, 1969 letter from Westerman to Dutcher). Unlike today where potentially toxic wastes are classified according to an EP Toxicity Test that indicates how caustic and how much leachate will be generated, *see* D.I. 513C at 126 (testimony of Leis), hazardous wastes were thought to be acids, flammables, and chemicals that would gassify. *See* D.I. 511 at 123–24 (testimony of Karins). Accordingly, the Delaware regulation of hazardous waste was directed at "acute features . . . if you touch them, you get burned or they blow up. . . ." D.I. 513C at 125 (testimony of Leis).

In preparation for the permit process, and to assist in the design of the landfill, the County consulted with a number of experts. Included in these discussions were state officials and individuals at the University of Delaware. *See* D.I. 511 at 102, 104 (testimony of Karins). County officials depended on the University to supply expertise the County lacked. *See id.* at 120–21.

The State's permit process required an investigation of the site. Two sets of test borings were drilled in conjunction with the investigation. At least one set of borings went deeper than required by the State. *See* D.I. 513B at 49 (testimony of Karins). The County also performed more borings than required by the regulations. Current standards are one hole per acre to one hole per five acres. One hole per two acres was the test ratio at Tybouts. *See* D.I. 513C at 97 (testimony of Leis).

Soil profiles were derived from the boring samples. A study of the soil showed overall low permeability at the Tybouts site. *See* D.I. 511 at 109–11 (testimony of Karins); D.I. 513B at 51 (same); Joint Exhibit ("JX") 4 at 2 (Report of Soils Laboratory Work, Nov. 18, 1968) (hereinafter

"Turner Report"). The Turner Report showed permeabilities ranging from $10^{-4}$ to $10^{-8}$. *See* JX 4. Concrete has a permeability of from $10^{-5}$ to $10^{-7}$, with the latter type currently being used as landfill liner. *See* D.I. 513C at 85–87 (testimony of Leis). The margin of error introduced by the testing method used does not bring the soil at Tybouts out of the low permeability range. *See* D.I. 513C at 152 (cross-examination of Leis).

■ There was no unequivocal testimony concerning the extent of a low permeability clay layer beneath Tybouts. At trial, CNA's expert witness discovered discrepancies in samples that led him to believe there was more clay in the substrata than County results showed. *See* D.I. 514 at 155 (testimony of Huntsman).[5] Conversely, the County's expert testified that he did not "think" there was a continuous layer of clay beneath Tybouts. *See* D.I. 513C at 156 (testimony of Leis). People working at Tybouts at the time observed that the clay was fairly consistent throughout. *See* D.I. 513D at 119 (cross-examination of Landa). Finally, the Court takes notice of the fact that currently only about half the states require low permeable liners for landfills. *See* D.I. 513C at 115 (testimony of Leis).

State regulations required two feet of separation between the deepest deposit of waste and the "anticipated high groundwater elevation." D.I. 503 at 3.9–3.10. This separation was a new technology at the time. *See* D.I. 511 at 107 (testimony of Karins). At a December 9, 1968 meeting, the University of Delaware and State officials agreed that the groundwater probably would not rise more than one foot above the level indicated by the borings. *See* D.I. 503 at 3.7. The State also required the maintenance of three wash ponds on the site, testing of surface and subsurface groundwater, *see* D.I. 503 at 3.9–3.12, and permission of WARC prior to dumping chemical or toxic materials. *See* JX 7, 9; DX 58. Additionally, depositing waste within 1000 feet of Red Lion Creek was prohibited. *See* D.I. 503 at 3.9.

The County also submitted a plan of operations, topographical maps, construction plans, soils boring dates, soils laboratory reports, soils profiles, and a contract for operating the site. *See* D.I. 503 at 3.5. The County submitted more information to the State than the permit process required. Although the County received advance approval to operate the site on October 28, 1968, the site was not utilized until the State gave its final approval. *See id.* at 3.6. On November 25, local residents expressed their concern over possible air and water pollution at a public hearing held by WARC. *See, e.g.,* DX 30 at 29, 39, 40–42. Based upon the information provided by the investigation, the public hearing held by WARC on November 25, 1968, and meetings at which the representatives from County, State, and the University of Delaware attended, the County received formal approval from WARC on December 9, 1968, and by the State Board of Health on December 23, 1968. *See id.* at 3.6. The approvals were for one year only. Approval for continued operation was granted the following year. From its opening, until it closed in July of 1971, the County had written approval from the State to operate the site. *See* D.I. 503 at 3.6 n. 1. The State Board of Health specifically concluded that Tybouts Corner was "reasonably suitable for use as a landfill." D.I. 503 at 3.8. Indeed, CNA's expert witness, who was the State Director of the Division of Solid Waste at the time Tybouts Corner was selected as a landfill site and began operating, testified that, "I didn't anticipate

---

5. The Court notes at this point that it does not rely to a great extent on the opinion of CNA's expert witness Huntsman. While clearly an expert in his field, he was shown to be singularly unfamiliar with the relevant evidence of the case. He had not read any deposition, taken for this case or the underlying cases, in its entirety, *see* D.I. 514 at 215; he did not study the main documents in the *USA* case, *see id.* at 216; he did not have all of the bore logs at the time he formed his opinion, *see id.* at 218; he was not familiar with the relationship between the Artesian Water Company and the Llangollen landfill, *see id.* at 198–99; he had not reviewed the lease agreement between Ward and the county, *see id.* at 192; and, finally, he did not know if he was breaking the law by testifying. *See id.* at 191. The Court finds his testimony unpersuasive.

any problems. I thought it would be a model landfill all around." D.I. 515 at 56 (testimony of Westerman).

The landfill began operating on or about January 1, 1969. *See* D.I. 503 at 3.10. Unless a truckload was homogeneous, it was difficult for those operating the landfill to police the contents of the refuse. *See* D.I. 515 at 53 (testimony of Westerman); D.I. 513B at 26 (cross-examination of Karins). Homogeneous loads of prohibited material were turned away. For example, full loads of tires were not permitted to be dumped. *See* D.I. 514 at 59–60 (deposition of White). Those responsible for the landfill checked with the State about questionable materials. *See* D.I. 513B at 23 (cross-examination of Karins). There is some evidence that the County was required to get written permission prior to permitting hazardous waste, *see* D.I. 514 at 55–58 (testimony of Stiegler), but material not classified as hazardous under the then existing standards did not require permission. *See* D.I. 515 at 63 (cross-examination of Westerman). There is further indication that the County solicited advice from the State over the telephone. *See* D.I. 515 at 51 (testimony of Westerman). One of the haulers was stopped on a few occasions so that operators of the landfill could receive clearance from the County prior to dumping. *See* D.I. 514 at 59–60 (White deposition). An additional example of the county's contact with the State is the correspondence concerning the waste from Fluorodynamics, that resulted in the discontinuation of that dumping at the landfill. The Director of the Division of Solid Waste, Robert Westerman, commended the County for its "attention and action" to the disposal of these wastes. JX 15. Refuse from Stauffer PVC was detained until the contents of the waste were approved for dumping. *See* D.I. 511 at 104 (testimony of Karins); D.I. 515 at 174–76 (cross-examination of Twardus).

As indicated in the discussion above, the State's primary concern with regard to the contents of the landfill was whether the site caused a public nuisance. As a representative of the State, Westerman expressed particular concern about seagulls and blowing paper in a February 27, 1969 letter to Karins. *See* D.I. 513B at 25 (cross-examination of Karins). Similarly, the State's concern with the hazardous Fluorodynamics waste was over fires, explosions, and cave-ins, *see* JX 15, not groundwater contamination. The owner of the site stated that he did his best to follow the HEW guidelines, *see* D.I. 513D at 91–92 (testimony of Ward), and the only hauler to testify said he had never dumped hazardous waste at Tybouts Corner. *See* D.I. 515 at 173 (cross-examination of Twardus).

While operating, the County provided more than the six inches of cover for the waste that was required by the permit, and went up to two feet over the top of the refuse to ensure proper coverage. *See* D.I. 511 at 126 (testimony of Karins). The depth at which garbage was deposited was determined by digging down to the water table and backfilling two feet. *See* D.I. 513D at 87 (testimony of Ward).

A slight deterioration of the wells at Tybouts Corner was found by July of 1969, *see* D.I. 511 at 42 (cross-examination of Varrin), although the University of Delaware found water quality improvement at times. *See* DX 43 at H00862. There was still no serious contamination by February of 1970. *See* D.I. 511 at 45 (cross-examination of Varrin). Nine months later, in November of 1970, contamination was still far below levels considered pollution. *See id.* at 48. Neither Red Lion Creek nor Pigeon Run had shown "any measurable deterioration due to the landfill" by April of 1971. *Id.* at 52. When Tybouts was closed on or about July 8, 1971, the Department of Natural Resources and Environmental Control agreed to continue to sample the wells. *See id.* at 137 (testimony of Karins).

Shortly after Tybouts stopped receiving waste, one of the wash ponds at the site turned black. It should be noted that the pond contamination did not kill the fish living in the pond. The fish were still alive in the first week of August, *see* D.I. 511 at 71 (cross-examination of Varrin), and did not die until the pond was heavily chlorinated in an effort to clean it up. *See* D.I. 513D at 119 (cross-examination of Landa).

In the first half of 1972, the State determined that the Llangollen landfill had contaminated a nearby well. *See* DX 44, DX 45.[6] In response to the Llangollen contamination the County engaged Edward H. Richardson Associates, Inc., to ensure that a similar problem did not exist at Tybouts. *See* D.I. 513B at 62 (testimony of Clark). The March 26, 1974 Richardson study (JX 24) found polluted water at or near the water table. *See* D.I. 513B at 63. This study also concluded that the garbage was usually within two to three feet of the water table. *See* JX 24 at 2–03. A study completed in November of that year, by Richardson (JX 25), found that the quality of water entering Tybouts Corner was equal to that leaving the site. *See* D.I. 513B at 64–65; D.I. 503 at 3.15. This study also found, however, that there were areas where trash had been saturated. *See* JX 25 at NCC 102663. The relative qualities of water entering and leaving Tybouts were found to be the same the following March, although the extent of trash saturation increased and there was some further contamination of groundwater. *See* JX 26 at 102719. Richardson concluded that the effects of pollutants continued to be attenuated by natural processes, *see* D.I. 503 at 3.15, and that Tybouts Corner was not an immediate threat to the surrounding environment. *See* D.I. 513B at 65–66; D.I. 503 at 3.15. It is uncontroverted that the Richardson reports were responsibly done. *See* D.I. 513D at 24 (testimony of Apgar).

As noted above, CNA and the County entered into four insurance contracts. CNA provided primary general liability cov-

erage from August 1, 1973 through July 1, 1974, *see* DX 35, and from July 1, 1974 through January 1, 1975.[7] *See* DX 36. These policies provide the same coverage:

The company will pay on the behalf of the insured all sums which the insured shall become legally liable to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

Neither policy before the Court defines "occurrence," "bodily injury," or "property damage," but the litigants agree that "occurrence" is "... an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." *See* D.I. 518 at 28–29; D.I. 519 at 39.[8] Additionally, the policies exclude "bodily injury or property damage arising out of the discharge, dispersal, release or escape of [pollution]," but exempt "sudden and accidental" pollution from the exclusion.

The second two policies provide umbrella excess third party liability coverage. Under "Coverage A" of the excess policies, CNA "will indemnify the insured for loss[9] in excess of the total applicable limits of liability of underlying insurance[10] stated in

---

6. These exhibits are admitted for the limited purpose of showing that a contamination problem at Llangollen existed. Except as specifically provided for in this opinion, all evidentiary objections are rendered moot.

7. This policy was originally issued to provide coverage through July 1, 1975, but was cancelled, cancellation effective January 1, 1975. *See* PX 74.

8. This definition of occurrence is taken verbatim from the Definition section of the excess policies. *See* DX 37; DX 38. The Court will, therefore, refer to this section for guidance when interpreting the policy language.

9. " 'Loss' means ... the sums paid as damages in settlement of a claim or in satisfaction of a judgment ... after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the underlying insurance...." DX 37 ("Definitions"); DX 38 (same).

10. "Underlying insurance means ... the insurance policies listed in the schedule ... including any renewal or replacement of such contracts, and also includes the insurance policies not listed ... for which notice has been given...." DX 37 ("Definitions"); DX 38 (same). The "Conditions" sections of the policies require the County to inform CNA of any change in under-

the schedule." *See* DX 37; DX 38. Both policies also have a "Defense Coverage Endorsement" for Coverage A that states

> [i]n the event of the cessation of the obligation of all underlying insurers either to investigate and defend ... or to indemnify ... or to pay ... costs and expenses of investigating and defending ... the company shall either (a) assume the duty of investigating and defending ..., or (b) indemnify the insured for the reasonable costs and expenses of investigating and defending....

*See* DX 37; DX 38. Coverage B of the excess policies states that "[t]he company will indemnify the insured, with respect to any occurrence [11] not covered by underlying insurance, or with respect to damages not covered by underlying insurance but which results from an occurrence covered by underlying insurance, for ultimate net loss [12] in excess of the insured's retained limit [13]...." (footnotes added). Coverage B also grants CNA the right and duty to defend any suit. The first excess policy ran from May 11, 1973 through July 1, 1974. *See* DX 37. The only relevent underlying policy listed in the schedule of underlying limits is a CNA policy, number and period "to be announced." [14] The second excess policy ran from July 1, 1974 through July 1, 1975. As noted above, the primary coverage provided by CNA was cancelled on January 1, 1975. The schedule of underlying insurance shows that Home Insurance Company provided primary coverage, effective January 1, 1975. [15]

Delaware, on May 14, 1976, informed the County that the well of Sara Wagner, which was a few hundred feet east of Tybouts, was contaminated. *See* D.I. 503 at 3.16. Three law suits have since been filed against the County. In *United States v. New Castle County*, Civil Action No. 80–489 (D.Del. filed Oct. 4, 1980) ("*USA*"), the Federal Government brought suit pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9604, 9606, 9607, 9613, to abate the contamination caused by Tybouts, and seeking "response costs." *See* D.I. 503 at 3.17, PX 69 at 1–3. The underlying concern of the *USA* action is the release of hazardous substances from the landfill to other properties. *See* PX 69 at ¶¶ 36, 45, 50, 51, 54. Sara Wagner brought suit on November 10, 1981. She alleges that the "County had a major role" in operating the landfill, *see* PX 68 at 3, and that migration of leachate from Tybouts contaminated her well. *See id.* at 4. The final suit is *Andrews v. New Castle County*, Civil Action No. 84–124 (D.Del. filed Mar. 2, 1984). The Andrews plaintiffs contend that there "are continuing releases and threatened releases of hazardous waste from" Tybouts that are polluting, and will continue to pollute, their drinking water, PX 70 at 23, and that the Tybouts pollution creates an "imminent risk of harm to the health and property of the plaintiffs." *Id.* at 24.

---

lying insurance. *See* DX 37 at Condition 1; DX 38 at Condition 1.

**11.** "Occurrence" *is* defined in these policies' definition section as it is defined *supra*.

**12.** "Ultimate net loss means the sums paid as damages ... after making deductions for all other recoveries, salvages and other insurances (whether recoverable or not) other than underlying insurance...." DX 37 ("Definitions); DX 38 (same).

**13.** "Retained limit means the amount stated in item 4 of the declarations [$10,000] or any other collectible insurance (other than underlying insurance ...) which is available to the insured." DX 37 ("Definitions"); DX 38 (same).

**14.** CNA, in its closing brief, makes reference to an Aetna policy in existence from May 11, 1973, when CNA commenced excess coverage, to August 1, 1973, when CNA began primary coverage. *See* D.I. 519 at 56. The period and terms of the Aetna policy are not before the Court, and the Aetna policy will, therefore, not be considered in this opinion, except to the extent this Court has already done so in *New Castle I & II*.

**15.** The Court will acknowledge the existence of this policy based on its listing in the schedule of underlying insurance of the excess policy. *See* DX 38. The terms of this policy have not been introduced, however, and the Court will not hypothesize as to the terms of the contract.

The *USA* action has settled. *See* D.I. 503 at 3.18; PX 72. The partial consent decree required the County to pay $385,440 for a preliminary portion of the "remedial action." PX 72 at 5. The County will be additionally liable for 35.9% of future work to be done in relation to the site. This percentage is currently estimated at $7.18 million. *See* D.I. 503 at 3.18.

## III. DISCUSSION

Primary coverage and excess coverage are two distinct issues. Because excess coverage will be determined, in part, on whether there is primary coverage, the Court will initially address primary coverage.

### A. *Primary Coverage*

The Court must analyze four criteria to determine whether CNA must afford the County primary coverage. The four criteria, distilled from the "Coverage" section of the policies, and the definition of occurrence, are: (1) whether the County must pay damages because of bodily injury or property damage; (2) whether such injury or damage "results, during the policy period"; (3) whether there was a "substantial probability" the injury or damage would occur, *New Castle II* at 1330, 1331; and (4) whether the "insurance applies," i.e., a determination of whether an exclusion is applicable. The Court, in *New Castle I*, found in favor of the County on the first criteria: "all of the underlying lawsuits at issue are included within the policies' definition of damages." *New Castle I* at 1366. Each of the remaining criteria will now be addressed in turn.

#### 1. Was the Trigger Pulled?

An insurance policy is triggered if damage occurs "during the policy period." *See Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034, 1042 (D.C. Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). CNA, relying on *Riehl v. Travelers Insurance Co.*, 772 F.2d 19 (3d Cir.1985), argues that there are "three possible triggering events ... (1) when the dumping first began; (2) when leaching first commenced; and (3) when the pollution was first discovered." *See* D.I. 519 at 47. As here, *Riehl* concerned a toxic dump that was polluting neighboring surface and groundwater. CNA misstates the Third Circuit's holding in *Riehl*, however. Not only does Judge Garth emphasize that neither the district court nor the parties addressed the issue of the trigger, he specifically stated that "[w]e do not decide this legal issue." *Riehl*, 772 F.2d at 23.

The *Riehl* court did, in its explanation of why summary judgment on the trigger should be denied, "note that in the somewhat parallel ... situation of asbestosis, the issue as to the particular event which triggers coverage, exposure ... latency ... or diagnosis—has been extensively litigated." *Id.* An example of that litigation, cited in *Riehl,* is *AC & S, Inc. v. Aetna Casualty & Surety Co.*, 764 F.2d 968 (3d Cir.1985). Recognizing the "somewhat parallel" nature of a disease that inflicts progressive bodily injury and the slow leaching of pollutants from a landfill to adjacent properties, this Court turns to *AC & S* for initial guidance.

*AC & S* concerned a contractor that installed insulation containing asbestos. Individuals exposed to the contractor's insulation sued for injuries arising out of the exposure. The contractor brought a declaratory judgment action against its insurance companies after the companies could not agree on who covered the risk. The court determined that the trigger of coverage issue turned on the definition of "bodily injury." *See id.* at 972. The definition of bodily injury was pivotal because only after determining what constituted bodily injury could the court determine when it occurred, i.e., which policy was triggered. The insurance policies in question defined bodily injury as "bodily injury, sickness or disease." *Id.* at 971. One insurance company focused on the term "disease," and argued that a disease is only a disease when it is diagnosed—the "manifestation theory." The other insurance company focused on the term "bodily injury" and concluded injury occurred at the time of exposure. AC & S contended "bodily injury"

was a broad term that encompassed exposure, manifestation, and, because "asbestos-related disease is progressive," exposure-in-residence. *Id.; see also Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034, 1042–43 (D.C.Cir. 1981) (same divergent arguments proposed by litigants). The *AC & S* court agreed with the district court, and the District of Columbia Circuit's opinion in *Keene*, that the phrase "bodily injury" was ambiguous. *See id.* at 972–73. Applying Pennsylvania law, the ambiguity was construed strictly against the insurance companies. The court held "that exposure, exposure-in-residence, and manifestation all constitute 'bodily injury' within the meaning of the policies." *Id.* at 973. *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 707 F.Supp. 762 (E.D.Pa. 1989), recently reaffirmed the vitality of the *AC & S* analysis. *Air Products* applied a continuous trigger and held the defendant insurance companies liable for defense and indemnification for personal injury claims arising out of exposure to asbestos and welding fumes. *See id.* at 767–69.

Following the framework provided in *AC & S*, the trigger issue in the present litigation turns on the definition of "property damage." Once defined, the Court can determine whether such damage occurred during a CNA policy period. The policies define property damage as "injury to ... tangible property." *See* DX 37 ("Definitions"); DX 38 (same).[16] Unlike the definition of bodily injury, which provides three possible hooks upon which litigants may hang their hats,[17] the definition of property damage provides just one—injury.[18] CNA implicitly argues, reminiscent of the policy's definition of bodily injury, that "injury" is limited to one of three discrete points in time: initial dumping, initial leaching, or initial discovery of pollution. *See* D.I. 519 at 47. The County contends that "injury" is a broad term that may encompass a process. *See* D.I. 518 at 23. Neither party

relies on terms of the policies to support its position. The Court notes, however, that no term in the insurance contract imposes a discrete temporal limitation on "injury." CNA's interpretation would require the Court to read such a limitation into the contract.

■ Delaware law requires ambiguous language in an insurance policy to be construed against the insurer. *See New Castle I* at 1362; *Hallowell v. State Farm Mutual Automobile Insurance Co.*, 443 A.2d 925, 926 (Del.1982); *Steigler v. Insurance Company of North America*, 384 A.2d 398, 400 (Del.1978); *National Union Fire Insurance Company v. Stauffer Chemical Co.*, 558 A.2d 1091, 1093 (Del.Super.Ct.1989). An ambiguity exists if the terms are susceptible to two or more reasonable interpretations. *See New Castle I*, at 1362; *Hallowell*, 443 A.2d at 926; *National Union Fire Insurance Co.*, 558 A.2d at 1093; *Cheseroni v. Nationwide Mutual Insurance Co.*, 402 A.2d 1215, 1217 (Del.Super.1979), *aff'd*, 410 A.2d 1015 (Del.1980).

The definition of the term "property damage" does not indicate at what point in time the gradual leaching of contaminants from a landfill will trigger the policy. In *Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir. 1981), the court considered the trigger of coverage issue in relation to diseases caused by asbestos. The court interpreted the term "injury," *see id.* at 1042–47, and concluded the policy did "not direct [it] unambiguously" to a particular trigger theory. *Id.* at 1043. The court held that "any part of a single injurious process" would trigger coverage. *Id.* at 1047. Similarly, in *Lac D'Amiante Du Quebec v. American Home Assurance Co.*, 613 F.Supp. 1549 (D.N.J.1985) ("*LAQ*"), the court considered the trigger issue in the context of asbestos related property damage and bodily injury. With respect to bodily injury, the court stated that "these provisions are ambigu-

---

**16.** *See supra* note 8 concerning definitional caveats.

**17.** These are bodily injury, sickness, or disease.

**18.** Neither party contends that the environment is intangible property.

ous in that they fail to articulate with any precision a point in the lengthy development of an insidious disease at which coverage is triggered," and adopted the reasoning of *Keene.* The court then noted that asbestos-related property damage was, like the asbestos-related diseases, both "continuous and progressive." *Id.* at 1561. Applying both *AC & S* and *Keene,* the *LAQ* court concluded that if any part of the injurious process took place during the policy period, the policy would be triggered. *See id.*

Although not urged by the parties to this action, this Court is cognizant of recent cases that require a showing of "actual injury" or "injury-in-fact" in order for a policy to be triggered. *See, e.g., Triangle Publications, Inc. v. Liberty Mutual Insurance Co.,* 703 F.Supp. 367, 371 (E.D.Pa. 1989); *Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368, 1388 (E.D.N.Y.1988). Courts that have adopted this standard in a continuous injury context have had to abandon a precise determination of when injury in fact did occur because of the evidentiary problems posed. In *Eagle–Picher Industries v. Liberty Mutual Insurance Co.,* 682 F.2d 12 (1st Cir.1982) (*"Eagle–Picher I"*), *cert. denied sub nom., Froude v. Eagle–Picher Indus.,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983), the First Circuit held that coverage for asbestos related diseases was triggered when a disease became diagnosable. *Id.* at 25. The district court's first attempt at applying this standard was appealed. The circuit court, in its second look at the case, accepted the district court's "conclusion that an individual date of diagnosability is impossible to discern.... The question then bec[omes] how best to *approximate the date....*" *Eagle–Picher Industries v. Liberty Mutual Insurance Co.,* 829 F.2d 227, 234–35 n. 11 (1st Cir.1987) (*"Eagle–Picher II"*) (empha-

sis added).[19] In *Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368 (E.D.N.Y. 1988), Judge Weinstein was faced with a similar situation concerning Agent Orange exposure: "the feasibility of identifying, even approximately, the time of injury in fact in many modern toxic tort cases must be in serious doubt.... Many injuries are not distinct events ... but are continuous or gradual insult-inducing processes." *Id.* at 1388. By stringing approximation after approximation,[20] Judge Weinstein was able to derive a formula with which to apply the injury-in-fact trigger imposed by New York State law. *See id.* at 1389–90. This approximation formula permitted "a clean differentiation of injuries." *Id.* at 1392.

Unfortunately, life in a landfill is not so "clean." The geography of each site is unique, and thus it is not possible to generalize at what rate pollutants will migrate from the site. Even sites relatively close together may be significantly different. For example, there are many differences in the geographic formation beneath the Tybouts and Llangollen sites. Both sites are above two strata: the Columbia and the Potomac. These two formations are connected at Llangollen, but do not come in contact at Tybouts. *See* D.I. 511 at 34, 81–82 (testimony and cross-examination of Varrin). There is a third formation at Tybouts between the Columbia and Potomac, the Merchantville, composed of black marine, that provides additional protection to the Potomac at Tybouts. *See* D.I. 513C at 105 (testimony of Leis); D.I. 513B at 76 (testimony of Clark). Additionally, the Potomac formation at Llangollen transmits water more quickly than the same formation at Tybouts. *See* D.I. 513B at 77 (testimony of Clark). Further, annual and seasonal changes in rainfall,[21] and the amount of water being pumped from the underly-

---

**19.** Significantly, the *Eagle–Picher II* decision places the burden of showing that the best approximate date does not apply on the insurance company. *See Eagle–Picher II,* 829 F.2d at 237.

**20.** The court approximated the time of spraying, the time the herbicide arrived in Vietnam, the length of time residue would be encountered,

and the length of time injury in fact occurred, *see id.* at 1389, in order to apply "the injury in fact wizardry" of New York law. *Id.* at 1393.

**21.** *Cf.* JX 25 at 5–01 (Richardson report noting the effect average, above-average, and below average rainfall has on the amount of saturated trash).

ing aquifers at any given point in time,[22] will also affect the rate of migration. As in the *Eagle–Picher II* scenario, it would be impossible in this case to determine when the first molecule of contaminant damaged neighboring property, or at what rate the contamination spread. This Court will not impose on either party the task of proving the impossible.

Two commentators, critical of the application of the continuous trigger in most property damage cases, acknowledge the applicability of the continuous trigger in a case such as Tybouts Corner:

> In a certain class of property damage cases factually more analogous to the progressive bodily injury situation, however, the continuous trigger may be appropriate. When chemicals from an improperly constructed toxic waste landfill leach slowly into adjacent property, for instance, new property may be affected with each passing day, while the damage to already affected property, and the associated costs of remedy, may increase steadily as well. But the law developed in the context of insidious diseases should be transported to the property damage context only when the facts support the analogy—when new injury is in fact continuously occurring.

Arness and Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases*, 72 U.Va.L.Rev. 943, 973 (1986) (footnote omitted).

The conclusion that an ongoing process of property damage will trigger every policy in effect during the ongoing injury is not novel, or limited to cases involving asbestos. As early as 1974, it was held that all policies in effect over the six years it took for a building to be damaged by dry rot were obliged to provide coverage. *See Gruol Construction Co. v. Insurance Company of North America*, 11 Wash. App. 632, 524 P.2d 427, 430 (1974). One year later the Court of Appeals for the State of New York held that the gradual cracking and settling of a building over a period of several months was a process that triggered insurance coverage. *See McGroarty v. Great American Insurance Co.*, 36 N.Y.2d 358, 368 N.Y.S.2d 485, 329 N.E.2d 172 (N.Y.1975).

The alleged property damage in the three underlying lawsuits is the contamination of water used by the residents of New Castle County who live near Tybouts. *See* PX 69 at 12–14; PX 68 at 6–7; PX 70 at 23–24. The process that led to this property damage began as early as the first half of 1969. *See* D.I. 511 at 42 (testimony of Varrin noting that there had been a slight deterioration of the wells at Tybouts by July, 1969). With the benefit of twenty/twenty hindsight, it is clear that the injurious process had fully matured by the effective date of the first CNA primary policy, and continued through the effective date of the second policy. The Richardson reports (JX 24–26) catalog a steady increase in the amount of saturated trash and a continual degradation of groundwater. *See* discussion, *supra*. The reports, dated March 26, 1974, November 13, 1974, and March 24, 1975, document at least a portion of the injurious process leading to the property damage in the underlying suits, and were completed while each of CNA's primary policies were in effect.

The Court finds the term "injury" as unenlightening as did the *AC & S, LAQ*, and *Keene* courts, and concludes that an entire injurious process may constitute "injury" under the terms of the policies. This conclusion is based primarily on the ambiguity of the term "injury" in that the policy imposes no temporal limitation on the word. Under Delaware law, ambiguities must be construed against the insurer. CNA's contention that the policy is triggered at only one of three discrete points in time is, therefore, rejected. Additionally, given the impossibility of determining the point in time any time-specific definition of injury took place, the reading of a temporal limitation into the policy would have the effect of depriving the County of all cover-

---

**22.** *See* discussion, *infra*, concerning the effect Artesian Water Company's pumping had on the Llangollen site.

age against a risk it would otherwise be insured against. The continuing damage caused by the gradual spread of leachate from Tybouts supports the analogy to the development of an insidious disease. The application of the continuous trigger to the present case is, therefore, appropriate. Thus, every policy, from the start of the injurious process, is triggered. Because the County has shown that new injury continuously occurred through the CNA policy periods, both of CNA's primary policies were triggered.

### 2. "Substantial Probability"

The definition of occurrence requires that the "accident or injurious exposure to conditions," in this case the migration of pollutants off of the Tybouts site, be "neither expected nor intended" for coverage to attach.

 This Court previously held that the terms "neither expected nor intended" in the definition of "occurrence" means that in order for property damage or bodily injury to be excluded from coverage, there must have been a "substantial probability" that the damage would occur. *New Castle II* at 1330, 1331. Similarly, the terms "sudden and accidental" in the pollution exclusion were held to mean "unexpected." *New Castle I* at 1364. Thus, only "expected" pollution would fall within the terms of the exclusion. The Court finds the definitions of "substantial probability" and "expected" to be indistinguishable, and therefore concludes that the term "occurrence" and the pollution exclusion clause are coextensive. *Accord U.S. Fidelity & Guarantee Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1157 (W.D.Mich.1988) (applying same definition to both the pollution exclusion and "occurrence"); *Broadwell Realty Services v. Fidelity & Casualty Co.*, 218 N.J. Super. 516, 528 A.2d 76, 85 (App.Div.1987) (holding the definitions coextensive); *CPS Chemical Co. v. Continental Insurance Co.*, 199 N.J.Super. 558, 489 A.2d 1265, 1270 (Law Div.1984) (pollution exclusion restates the definition of occurrence), *rev'd on other grounds*, 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985); *Jackson Town-*

*ship Municipal Utilities Authority v. Hartford Accident and Indemnity Co.*, 186 N.J.Super. 156, 451 A.2d 990, 994 (Law Div.1982) (interpreting both clauses to mean "expected," and holding that the pollution exclusion is a restatement of occurrence). The two issues will, accordingly, be considered jointly. The Court further notes that regardless of whether one uses a subjective or objective standard when considering whether off-site property damage was expected, the analysis must necessarily be restricted to what was expected at that time. A risk is only excluded by the terms of the policy if there was a substantial probability, at the time the coverage was purchased, that the risk would come to fruition. *See Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 63 (3d Cir.1982).

For analytical purposes, the life of the Tybouts Corner landfill will be divided into three stages: pre-operation, when the County gathered information and submitted applications for the approval of the site as a landfill; operation; and, post-operation. CNA alleges that there was a substantial probability of off-site contamination in the pre-operational phase of Tybouts. There are two related bases for this contention: that the County knew there was not a continuous layer of clay beneath the site, and that the county withheld from the State a letter (DX 34) suggesting the collection of additional boring data. The Court has already noted: (1) that current standards require that a bore hole, for sample purposes, be taken from one hole per acre to one hole per five acres; and (2) that the County had one bore hole for every two acres sampled at Tybouts. The letter from Turner, DX 34, suggested a three-step process. Sampling the entire site on a 200–foot grid, then sampling a local grid of 100 feet, and then a "local-local" 50–foot grid. *See* DX 34 at 2. Not only would that regimen be excessive under today's standards, CNA's own witness stated that he did not know if the letter would have been relevant, given the 1000–foot distance to Red Lion Creek. *See* D.I. 515 at 46 (testimony of Westerman). This 1000 foot margin is particularly significant when deter-

mining the expectations of those who designed Tybouts Corner: "we had maintained the landfill to be 1000 feet away from the creek, and we thought that was adequate no matter what, even if water would get through." D.I. 515 at 46 (testimony of Westerman). The Court concludes that it was not important for this letter to be submitted to the State during the permit process.

■ At trial, using current data analysis techniques, experts could not conclusively state the extent of the low-permeability layer beneath Tybouts. Weighing all the evidence presented, including the Turner Report (JX 4), expert testimony, and the observations of individuals at the site, the Court concludes that county officials could reasonably believe that there was a sufficient amount of low-permeability material beneath Tybouts to protect nearby properties from damage. The Court adopts CNA's witness' evaluation of the site at the pre-operation phase: those involved thought that it would be "a model landfill." D.I. 515 at 56 (testimony of Westerman). Consequently, there was no "substantial probability" of an occurrence prior to the landfill's opening.

■ There is little legal significance to CNA's contention that the County permitted chemical waste to be dumped at the site. At the time *New Castle II* was decided, the issue of chemical waste dumping appeared to be a material fact. *See New Castle II* at 1325. CNA offered unrefuted evidence, however, that leachate would have eventually caused property damage even had all chemical waste been turned away from the site. *See* D.I. 511 at 126 (testimony of Huntsman); DX 33 at 21 (concluding that contamination would have occurred absent liquid and chemical waste). As CNA recognizes, "[t]he issue is not how extensive the damages would ultimately be, but the issue is did the county know ...

that the pollution would cause some damage." D.I. 519 at 45. In order for evidence concerning chemical waste to be relevant, therefore, CNA must show, at least, that the depositing of chemical waste increased the probability of property damage. CNA has not shown that chemical waste disperses quicker or wider as leachate than other forms of leachate. More significantly, CNA has not shown that it was *expected*, in the period from 1968 to 1975, that chemical waste would exacerbate a leachate problem. In fact, the evidence indicates the contrary. Chemical waste was deemed a hazard, not because of its effect on water sources, but because of its effects when individuals came in direct contact with it. *See* D.I. 513C at 125 (testimony of Leis); D.I. 511 at 123–24 (testimony of Karins). The only waste the State objected to was objected to because of the potential it had for fires, explosions, and cave-ins. *See* JX 15 (concerning Fluorodynamics). Potential contaminative effects were not mentioned. The evidence concerning chemical dumping is not relevant, as a matter of law, to the occurrence issue.[23]

The method used to determine the depth of the water table while Tybouts operated is suspect. County officials knew that a two-foot separation between trash and groundwater had to be maintained. County officials also knew that the groundwater would rise approximately one foot. *See* JX 8. The method used, digging to the water table and backfilling two feet, means the County could only expect a one-foot separation after the water level rose. There is no evidence on the record, however, indicating the county knew that Ward was depositing refuse in this manner. Assuming the County was aware of this practice, the most that could be inferred from providing a one-foot instead of a two-foot separation, is that the County was negligent. The

**23.** Aside from the waste from Fluorodynamics, not one witness testified to the actual chemical composition of any of the alleged hazardous waste. Both the owner of the site, and the only waste hauler to testify, denied dumping hazardous waste. *See* D.I. 513D at 91–92 (Ward); D.I. 515 at 173 (Twardus); *see also* D.I. 514 at 115

(White deposition). With regard to the Fluorodynamics waste, the County was commended by the State for its action in that case. *See* JX 15. It would be anomalous to conclude the County expected property damage to result from an action for which it received commendation.

negligence of one foot of earth, in this case, does not rise to the level of substantial probability. This conclusion is drawn almost directly from the definition of negligence. An act exhibiting a substantial probability of harm demonstrates recklessness, not negligence. Additionally, the insurance contract does not exclude property damage caused indirectly [24] by negligent behavior. *See, e.g., Lancaster Area Refuse Authority v. Transamerica Insurance Co.,* 437 Pa. 493, 263 A.2d 368, 369 (1970) (involving property damage caused by a landfill). This is particularly true in light of the fact that almost three years after Tybouts closed, a two to three-foot separation between refuse and groundwater was "usual" over the entire site. *See* JX 24 at 2–03 (Richardson Report of March 26, 1974). This observation brings into doubt whether the trash was actually as deeply buried as testified to.

■ The University of Delaware reports indicate the process of leachate migration from Tybouts may have begun as early as 1969. *See* discussion *supra.* These reports consistently concluded, however, that the site did not pose a significant danger. An August 1969 University of Delaware report stated: "the movement of ground water toward Pigeon Run does not necessarily mean pollutants will reach Pigeon Run. *There is every reason to believe that attenuation of the pollutants will occur during the movement through the sediment."* *See* DX 43 at H00861 (emphasis added). In February and November of 1970, no serious degradation had been discovered. *See* D.I. 511 at 45, 48 (cross-examination of Varrin). Three months before Tybouts closed, neither stream bordering the site had been affected. *See id.* at 52. It was eminently reasonable for the County to conclude, based on those test results, that Tybouts posed no risk to surrounding properties.

Three episodes must be considered in the post-operation stage: the black pond incident; contamination found at Llangollen; and, the "Winterim" report.

■ Within a month of the date Tybouts ceased to accept refuse, the fresh water pond at the site turned black and a number of surface seepages of leachate appeared. A wash pond Ward established at a high elevation caused the black pond incident by increasing the water pressure on the underlying trash and accelerating the natural recharging process. *See* D.I. 511 at 29–30 (testimony of Varrin); *id.* at 140–41 (testimony of Karins); D.I. 513C at 112 (testimony of Leis). The black pond incident did not indicate that Tybouts Corner would eventually pollute the underlying aquifers. *See* D.I. 511 at 89 (cross-examination of Varrin). In fact, the black pond, and associated surface seepages, indicated the landfill was functioning as expected. *See id.* at 30. The appearance of leachate on the surface, in response to the added water of the Ward operation, indicates that water is not escaping below, into the water table. *Cf.* D.I. 513D at 8 (noting that the prevention of vertical and horizontal movement of water at a landfill will cause leachate to seep out at the surface) (testimony of Apgar). At Tybouts Corner, the appearance of leachate on the surface indicates that "the subsurface is relatively impervious because the water is breaking out on the surface rather than moving vertically." *Id.* at 39. Consequently, surface leachate indicates that leachate is being produced, not that there is migration of contaminants. *See* D.I. 514 at 27 (testimony of Jordan).

The second episode is the discovery of contamination caused by the Llangollen landfill. CNA's contention that "once Llangollen went, it was known to the County that Tybouts Corner would pollute ...," D.I. 519 at 43, must be rejected. The problems observed at the Llangollen landfill were important in *establishing* theories of leachate production and migration in Delaware. *See* D.I. 514 at 23 (testimony of Jordan). Prior to the contamination of the

---

24. "Indirectly" because the negligent act itself did not disperse contaminants, but was alleg-

edly part of a process that did lead to dispersal.

Reni well by the fill at Llangollen, it was "a matter of theory" that leachate could migrate; the Reni well established it as fact. *Id.* at 25; D.I. 515 at 27 (cross-examination of Vasuki). The different geographic characteristics make Tybouts a safer site for a landfill than Llangollen. *See* D.I. 513 at 106 (testimony of Leis).[25] Finally, the Llangollen problem was exacerbated by an increase in the pumping of drinking water by the Artesian Water Company. *See* D.I. 514 at 38 (cross-examination of Jordan); D.I. 513D at 48 (cross-examination of Apgar).

■■■ Assuming the Winterim report is admissible as evidence, CNA's reliance on it to show a substantial probability of property damage is unavailing. Four undergraduate students collected the information for the report as a winter semester project. *See* D.I. 515 at 75. One of these undergraduates prepared the report from the data. *See id.* at 76. The report includes approximately three quarters of a page on Tybouts Corner. *See* DX 50 at 5–6; D.I. 515 at 84. The students noted some surface seeps and concluded there was no immediate threat to the water supply posed by the landfill. *See* DX 50 at 12; D.I. 515 at 84. The report does not raise a substantial probability of off-site pollution.

There was neither a "substantial probability" nor an "expectation" that off-site pollution would occur, prior to the discovery of the contamination of the Wagner well. The County could reasonably rely on the expectations of the professionals who designed the site and the reports confirming the landfill was behaving in a manner consistent with its design. The Court holds there was an occurrence, within the meaning of the policy, and that the pollution exclusion is not applicable. CNA must provide coverage under both primary policies.

### 3. Owned Property Exclusion

■■■ CNA argues that any coverage afforded by its primary policies is limited to

$5,000 for each occurrence. This argument is based on the Owned Property Exclusion: "This insurance does not apply ... (k) to *property damage* to (1) property ... occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured...." (Emphasis added.) This exclusion was deleted, and limited coverage was provided.[26] CNA's argument assumes exclusion (k) would have applied. Exclusion (k) would not have applied, however, because the property damage at issue is not damage to the County's property. Damage to property owned, rented or controlled by the County is the only damage excluded. The property damage at issue is the property damage forming the basis of the *USA, Wagner,* and *Andrews* lawsuits. The County does not own, rent, or control the property damaged in these three underlying lawsuits, i.e., it is off-site property damage and the continued threat of off-site property damage for which the County is being held liable. Therefore, the property damage of concern is not damage "to property in the care, custody or control" of the County. Neither exclusion (k), nor its replacement, apply. *Accord Allstate Insurance Co. v. Quinn Construction Co.,* 713 F.Supp. 35, 40–41 (D.Mass.1989) (holding that the owned property exclusion does not bar recovery for environmental cleanup intended to prevent damage to property of third parties); *Gloucester Township v. Maryland Casualty Co.,* 668 F.Supp. 394, 400 (when clean-up "costs are inextricably linked to damage claims of a third party" the ownership exclusion does not excuse the insurance company from coverage; *Consolidated Rail Corp. v. Certain Underwriters at Lloyds,* No. 84–2609 (E.D.Pa. June 5, 1986) (1986 WL 6547) (same) *aff'd,* 853 F.2d 917 (3d Cir.1988); *Broadwell Realty Services v. Fidelity & Casualty Co.,* 528 A.2d 76, 82 (N.J.Super.Ct.1987) ("we reject Fidelity's argument that such expenses are not reimbursable by reason of

---

**25.** *See also* discussion *supra* concerning the differences between the two sites.

**26.** The endorsement states that "Exclusion (k) ... is deleted with respect to property in the

care, custody or control of the Named Insured ... subject to the limits of liability stated below:

| | |
|---|---|
| Coverage B | $5,000 each occurrence |
| | $25,000 aggregate occurrence |

the policy language which excludes from coverage 'damage to property owned ... by ... the insured'...."). The limited coverage afforded by the endorsement is not applicable, and CNA must provide coverage up to full policy limits.

### 4. Proration/Allocation of Primary Coverage

 The primary policies state that CNA will pay "all sums which the insured shall become legally liable to pay." The law in this circuit is that the policy means exactly what it says: "there is no proration of losses under a policy once coverage is triggered." *AC & S, Inc. v. Aetna Casualty & Surety Co.*, 764 F.2d 968, 974 (3d Cir.1985). An insurance company's liability to an insured is contractual. The terms of the contract are not affected by prior or subsequent coverage. *See Sandoz, Inc. v. Employer's Liability Assurance Corp.*, 554 F.Supp. 257, 266 (D.N.J.1983). CNA's contract with the County dictates that CNA is liable to the County for all damages arising out of Tybouts Corner.

 Nevertheless, CNA argues that liability should be allocated among all policies triggered. However, the Court is not faced with an allocation/proration issue. In its argument concerning proration and allocation, *see* D.I. 519 at 61–62, CNA does make reference to other policies that may be implicated, but cites no evidence that provides any of the terms of those policies. Aside from the policy limits of the Home Insurance policy listed in the schedule of underlying insurance of one excess policy, no evidence of primary coverage, other than CNA, was presented at trial.[27] Thus, even if the law authorized proration, there is insufficient evidence to do so.[28] CNA *may be* entitled, based on an "other insurance" clause, to seek contribution from other carriers whose policies have been triggered. *See Dayton Independent School District v. National Gypsum Co.*, 682 F.Supp. 1403, 1411 n. 21 (E.D.Tex.1988).[29] Because only rights among carriers are implicated by the "other insurance" clause, contribution and allocation among insurers may not impose any liability on the County. *See Air Products*, 707 F.Supp. at 771; *Dayton Independent School District*, 682 F.Supp. at 1410–11.

### B. *Excess Coverage*

Coverage A of CNA's excess policies provide that CNA will cover the County "for loss in excess of the total applicable limits for underlying insurance stated in the schedule." Underlying insurance includes "renewal or replacement" policies and policies "not listed in the schedule of underlying insurance for which notice has been given." Loss is defined by the policy as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment ... after making deductions for ... other insurances (whether recoverable or not) other than the underlying insurance."

 Exhaustion of underlying insurance triggers excess coverage. *See Occidental Fire & Casualty Co. v. Brocious*, 772 F.2d 47, 54 (3d Cir.1985); *St. Paul Fire & Marine Insurance Co.*, 691 F.2d 468, 469–70 (10th Cir.1982); *Valentine v. Aetna Insurance Co.*, 564 F.2d 292, 296 (9th Cir. 1977), *Couch on Insurance* § 62:48 (2d ed. 1983); J. Appleman, 8a *Insurance Law & Practice* § 4909 (1981). Despite the parties

---

**27.** The Court notes that U.S. Fire provided some type of coverage from 1969 to 1972. *See* DX 63 at 47. The terms and limits of this policy were not introduced in evidence.

**28.** Because there are only CNA policies in evidence, and those policies must provide coverage, the Court does not reach the County's argument that it may pick any triggered policy, in this case CNA, and force that insurer to provide primary coverage. *See* D.I. 503. The Court notes, however, that the Third Circuit clearly rejected this position in *AC & S, Inc. v. Aetna Casualty & Surety Co.*, 764 F.2d 968 (3d Cir.

1985). There, the court faced with a number of triggered policies held: "We will vacate the declaration [of the District Court] insofar as it assumes that, in a case in which coverage under more than one policy has been triggered, ACandS may designate a particular policy for full indemnification." *Id.* at 975. CNA, however, is the only triggered policy in evidence, and must provide full coverage.

**29.** The Court notes that it has been unable to locate an "other insurance" clause in the CNA primary policies introduced as evidence.

best efforts to avoid it, some evidence was introduced relevant to this point.[30]

■ For the first policy, effective from May 11, 1973 through July 1, 1974, only CNA is listed as providing primary liability coverage. No evidence of other primary coverage was introduced. *See supra* note 14.[31] Similarly, there was no evidence that the county gave notice of policies not listed in the schedule, and CNA has not claimed that the County violated the terms of the policy by failing to give the required notice. *See* D.I. 519 at 60–61. Given that there is no evidence of other primary coverage, once CNA's first primary policy, DX 35, is exhausted, the first excess policy, DX 37, must provide full coverage, including a defense. *See* DX 37 at "Defense Coverage Endorsement."

■ There *is* a replacement policy listed in the "Schedule of Underlying Insurance" of the second excess policy, DX 38. Home Insurance provided primary liability coverage, effective January 1, 1975. Coverage A of the excess policy only covers the County "for loss in excess of the total applicable limits ... of underlying insurance." DX 38 at "Coverage A."[32] The Home policy is "underlying insurance" within the meaning of the policy.[33] The County has failed to offer any evidence showing that this policy was exhausted. There is therefore no loss in excess of the total applicable limits, and CNA has no duty, to date, to indemnify the County under the terms of the second excess policy. *See Dayton Independent School District*, 682 F.Supp. at 1411 n. 23.

■ The *Andrews* and *Wagner* suits are still pending, and the County may be able to show that all primary insurance is exhausted at some point in the future. The County's claim against the second excess policy is premature, *with respect to the duty to indemnify*, and the Court will dismiss it without prejudice. If the County subsequently shows exhaustion of the primary insurance underlying the second excess policy, the second excess policy would also be required to respond in full.

### C. Cost of Mitigation

CNA puts forth two arguments for its liability to be reduced to the extent that the County is required to mitigate damages. First, CNA contends that Coverage B of the first excess policy, DX 37, contains a mitigation clause that precludes coverage. This contention is inapplicable to the present case. The parties agree that Coverage B only provides coverage for occurrences not covered by underlying insurance. *See* D.I. 519 at 57; D.I. 518 at 21. The Court has already held that there was an occurrence covered by the two CNA primary policies. The mitigation exclusion of Coverage B does not apply.

■ CNA's second argument concerns Coverage A of the Excess policies: "The company will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule. The provisions of the immediate underlying policy are ... incorporated...." The crux of the argument is that both the Aetna and Home primary policies contain mitigation clauses that exclude coverage under the incorporation clause. CNA's argument is faulty because,

---

**30.** The Court need not determine whether settlement requiring payment of less than the limits of a primary policy will trigger coverage. *See Stargatt v. Fidelity & Casualty Co.,* 67 F.R.D. 689, 690–91 (D.Del.1975) (holding that the amount paid may be less than the primary policy limit and still trigger excess coverage), *aff'd,* 578 F.2d 1375 (3d Cir.1978). The terms of the settlement among the insurance companies in the *USA* action were not submitted as evidence.

**31.** Neither *New Castle I* nor *II* concluded that Aetna provided primary coverage while CNA provided excess coverage.

**32.** The parties agree that Coverage B only provides coverage for occurrences not covered by underlying insurance. *See* D.I. 519 at 57; D.I. 518 at 21. The County has not argued that the Home policy does not cover this occurrence. The Court has already held that there was an occurrence covered by the two CNA primary policies. Therefore, Coverage B does not apply.

**33.** Contrary to the County's assertion, *see* D.I. 520 at 15, this is a policy condition requiring proof of exhaustion of the limits of other carriers.

even were these policies in evidence, the argument ignores the fact that its own primary policies are also incorporated under this clause. The CNA primary policies do not contain mitigation clauses. If the terms of both primary policies underlying each excess policy were held to apply, an ambiguity in coverage would be created: one policy underlying each excess policy excludes mitigation costs and one does not. As discussed above, under Delaware law all ambiguities in an insurance contract must be construed against the insurer. Construing the ambiguity against CNA, the first excess policy must respond in full, immediately. Alternatively, applying the terms of the CNA primary policies alone would also trigger the excess policy in full. CNA is not entitled to proration for the short period of time the Aetna and Home policies were in effect because once a policy is triggered, it is triggered in full; there is no proration. *See AC & S*, 764 F.2d at 974; *LAQ*, 613 F.Supp. at 1562.

### D. *Duty to Defend Andrews and Wagner Suits*

■ The County requests an order requiring CNA to cover the defense of the *USA*, *Wagner*, and *Andrews* suits. *See* D.I. 518 at 69. CNA has not denied that it must pay for the defense of both the *USA* and *Wagner* actions. CNA does deny that it is liable for either indemnification or defense of the *Andrews* claim. Because no liability has yet been found in the *Andrews* suit, a determination regarding CNA's duty to indemnify in that action would be premature. Any ruling on CNA's duty to indemnify would force the Court to construct a hypothetical factual situation, thereby rendering an advisory opinion. Delaware law

prohibits such action. *See North American Phillips Corp. v. Aetna Casualty & Surety Co.*, 565 A.2d 956, 961 (Del.Super.Ct.1989); *Monsanto Co. v. Aetna Casualty & Surety Co.*, 565 A.2d 268 (Del.Super.Ct.1989); *Rollins International, Inc. v. International Hydronics Corp.*, 303 A.2d 660 (Del.1973).

Concerning CNA's duty to defend the *Andrews* suit, this Court has already held "that regarding these two questions of law [the definition of damages and the meaning of the pollution exclusion] the insurers are obligated to defend the County in the five underlying lawsuits." *New Castle I*, at 1366. The *Andrews* claim was specifically included in that holding when this Court found the plaintiffs in that suit sought "damages ... for injury ... caused by the discharge of pollutants from Tybouts Corner landfill into plaintiffs' drinking water." *Id.* at 1362. CNA raises no new issues relevant to the duty to defend and is precluded from relitigating the exact same issue now.[34] The County's request for defense costs will be granted.

### E. *Attorneys' Fees*

The CNA primary policies cover the County for all sums it becomes "legally obligated to pay as damages." As the title of the policy suggests, "Comprehensive General Liability Insurance," the policy is one of liability insurance. *See* A. Windt, *Insurance Claims Disputes* 298–99 (2d ed. 1988); *see also Black's Law Dictionary* 723 (5th ed. 1979). Delaware law provides for the award of attorneys' fees to a prevailing plaintiff when judgment is rendered against an insurer providing property in-

---

**34.** The Court finds CNA's argument to be extremely disconcerting. CNA's attorneys are presumably cognizant of Rule 11, which states in pertinent part that "[e]very pleading, motion, and other paper ... [must be] warranted by existing law or a good faith argument for the ... modification, or reversal of existing law...." CNA's attorneys have not pointed to one iota of evidence introduced at trial, or to one subsequent court decision, that would warrant a "modification or reversal" of this Court's holding in *New Castle I. See* D.I. 519 at 58–60.

CNA's argument skirts the fringes of the Rule. *See, e.g., Southern Leasing Partners, Limited v. McMullan*, 801 F.2d 783 (5th Cir.1986) (holding that it was within the discretion of the trial court to impose sanctions against an attorney for *failure to investigate the law of the case* prior to filing a claim that was the "mirror image" of counterclaims previously dismissed); *Columbus v. United Pacific Ins. Co.*, 641 F.Supp. 707 (S.D. Miss.1986) (imposing sanctions against party for attempting to relitigate claims foreclosed by a prior judgment), *aff'd*, 833 F.2d 1007 (5th Cir. 1987).

surance.[35] The Code defines property insurance as "insurance on real or personal property of every kind and of every interest therein against loss or damage ... other than noncontractual legal liability...." *Del.Code Ann.* tit. 18, § 904 (1974). The issue before the Court is whether liability insurance is property insurance, at least for the purposes of the attorneys' fees statute.

The Delaware courts have not ruled on this issue. This Court must, therefore, predict the manner in which the Delaware Supreme Court would decide the matter. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Wilson v. Asten–Hill Manufacturing Co.,* 791 F.2d 30, 32 (3d Cir.1986); *Lang v. New York Life Insurance Co.,* 721 F.2d 118, 119 (3d Cir.1983); *Valley Forge Insurance Co. v. Jefferson,* 628 F.Supp. 502, 504 (D.Del.1986); *Carlisle v. White,* 545 F.Supp. 463, 464 (D.Del.1982). Delaware courts construe this attorneys' fees statute fairly strictly. *See Honaker v. Farmers Mutual Insurance Co.,* 313 A.2d 900, 904 (Del.Super.Ct.1973) ("attorneys fees will not be awarded unless clearly provided for"). This Court must apply "the clear import of the statutory provision." *Galliotti v. Travelers Indemnity Co.,* 333 A.2d 176, 179 (Del.Super.Ct.1975). The import of the statute is that in order for a policy to be classified as property insurance, the insured must have an "interest" in the damaged property. Where there is no such interest, no policy of property insurance will be recognized under Delaware law. *See Huber v. Penn Mutual Fire Insurance Co.,* 42 Del. 369, 33 A.2d 729, 740 (Del.Super.Ct.1943); *Draper v. Delaware State Grange Mutual Fire Insurance Co.,* 91 A. 206, 207 (Del.Super.Ct. 1914). This Court has already held, in its discussion of the owned property exclusion, that the County has no interest in the damaged property, i.e., the property at issue in the *USA, Andrews,* and *Wagner* suits. Where the insured has no interest in the damaged property upon which the claim is based, the policy is not one of property insurance. The Court has not rendered judgment upon a policy of property insurance. The County's request for attorneys' fees will be denied.

## IV. CONCLUSION

Based on the findings of fact and conclusions of law stated in this opinion, the Court will enter judgment in this case which shall: (1) grant the County's motion for a declaration that CNA, under the terms of the two primary policies, has (a) a duty to defend the County from all claims alleging property damage or bodily injury caused by Tybouts until the policy limits are exhausted, and (b) a duty to indemnify the County for all damages, as defined in *New Castle I,* arising from lawsuits alleging property damage or bodily injury caused by Tybouts until the full policy limits are exhausted; (2) grant the County's motion for a declaration that the first excess policy must defend and indemnify once the first primary policy has been exhausted; (3) dismiss without prejudice the County's motion concerning the second excess policy; (4) deny CNA's request for proration or allocation of coverage among insurers; (5) deny CNA's motion for a declaration that either Aetna's or Home's mitigation clauses apply; (6) deny CNA's motion for a declaration that the owned or leased property exclusion applies; (7) deny CNA's motion for a declaration that the pollution exclusion applies; and (8) deny the County's request for attorneys' fees.

---

35. "The Court upon rendering judgment against any insurer upon any policy of property insurance, as 'property' insurance is defined in § 904 of this title, shall allow the plaintiff a reasonable sum as attorneys' fees to be taxed as part of the costs." *Del.Code Ann.* tit. 18, § 4102 (1974).