### In re THE WALLACE & GALE CO., Debtor

**The Aetna Casualty and Surety Company, Plaintiff**

v.

**The Wallace & Gale Co., et al., Defendants**

**Bankruptcy No. 85–A–0092. CIV.PJM No. 94–2327.**

United States District Court, D. Maryland, Southern Division.

Feb. 20, 2002.

Leonard P. Goldberger, Esquire, Philadelphia, PA, Lee H. Ogburn, Esquire, Baltimore, MD, Armand J. Volta, Jr., Baltimore, MD, Jacob A. Stein, Esquire, Washington, DC, for Plaintiffs.

Christopher C. Tsien, Esquire, Columbia, MD, Stanley J. Levy, Esquire, New York, NY, Carl E. Tuerk, Jr., Esquire, Baltimore, MD, Glen P. Brock, III, Esquire, Atlanta, GA, William J. Bowman, Esquire, Washington, DC, James W. Greene, Esquire, Washington, DC, Richard C. Whiteford, Esquire, Baltimore, MD, Harry Lee, Esquire, Washington, DC, Donna L. Jacobs, Esquire, Baltimore, MD, Michael B. Mann, Esquire, Towson, MD, John E. Heintz, Esquire, Washington, DC, H. Russell Smouse, Baltimore, MD, Richard Allen Ifft, Esquire, Washington, DC, for Defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

This case concerns insurance coverage for claims of asbestos-related bodily injury against Wallace & Gale, Inc., an insulation contractor currently in bankruptcy. The Intervenors are four (4) former employees of the Bethlehem Steel Plant at Sparrows Point in Baltimore or their personal representatives, all of whom have filed such claims.[1] A specially-named legal representative represents unknown claimants who may file such claims in the future.[2] Defendants are insurance companies that provided either primary or excess insurance policies to Wallace & Gale between 1962 and early 1985.[3]

The Intervenors, Travelers, Hartford/St. Paul, and Granite State/New Hampshire have submitted Cross–Motions for Summary Judgment raising the following issues:

1) Is each insurer liable for "all sums" payable on any claim for asbestos-related injuries that Wallace & Gale may be found liable to pay?

Or is an insurer's liability limited to a pro-rata share of all sums payable, measured by the time the insurer was on the risk relative to the entire period of coverage?

2) Are claims subject to an aggregate limit by reason of the "completed operations hazards" provisions of the policies?

3) With regard to Travelers' policies covering the period 1962–65, have the Intervenors presented sufficient evidence (a) that the policies are lost and (b) if so, of the terms, conditions and scope of coverage under the policies?

1. The Intervenors are Roy E. Jones, Andrew R. Younghan, Louise Holcomb as Personal Representative of the Estate of Cossie Holcomb, and Robert M. Barber as Personal Representative of the Estate of Milton Barber.

2. The Intervenor Legal Representative for Unknown Future Claimants has adopted the Intervenors' Motion for Summary Judgment.

3. The primary insurers, Travelers Casualty Insurance Company (formerly known as Aetna Casualty and Surety), Hartford Insurance Company, St. Paul Fire & Marine Insurance Company, and Granite State Insurance Company, issued comprehensive general liability (CGL) policies to Wallace & Gale covering the periods January 1, 1962 to April 1, 1983 and September 30, 1984 to January 24, 1985. Travelers issued the majority of the primary policies: 18 annual policies between January 1, 1962 through December 31, 1979.

The excess insurers, Continental Casualty Co., Riunione Adriatica de Sicurta ("Adriatica"), St. Paul, and New Hampshire Co., issued policies covering the period January 1, 1980 to January 25, 1985.

The precise dates that each insurer provided coverage and the scope of the coverages are set forth in Appendix *A* hereto.

4) With regard to the Granite State and New Hampshire policies, is coverage precluded by reason of the "expected or intended" injury clauses of the policies?

## II.

A) Beginning in approximately 1930 and continuing until the early 1970s, Wallace & Gale supplied and installed asbestos-containing insulation materials at various industrial and commercial buildings throughout Maryland. Among these was the Bethlehem Steel Plant at Sparrows Point. In the course of its work, Wallace & Gale personnel regularly cut asbestos materials, generating asbestos dust and other debris, some of which was inhaled by individuals on-site, including workers at the Sparrows Point Plant. As a result, several of these individuals developed or claim to have developed asbestos-related diseases.

Wallace & Gale ended its operations in the early 1970s, in large part due to the problems associated with its asbestos-related activities. Eventually it was forced into bankruptcy, in the course of which a substantial number of asbestos-related bodily injury claims followed, including those of the Intervenors. Wallace & Gale had several CGL policies providing possible coverage of these claims. From the outset, however, the Insurers disputed the extent of both their duty to defend or indemnify against the claims. Those disputes led to a withdrawal of reference of the issues from the Bankruptcy Court and their return to this Court for determination. Earlier in these proceedings, after extensive briefing and argument, the Court determined that each of the Insurers did indeed have a duty to defend, given that the various claims had the potential of triggering coverage under each of the several policies.

The parties then returned to the Bankruptcy Court to develop a Plan of Reorganization, which was eventually established and approved. The Plan provides that the Insurers will create a trust fund that will assume any liability Wallace & Gale may ultimately be determined to have with respect to asbestos-related bodily injury claims. The principal assets of the trust will be Wallace & Gale's rights under these insurance policies. The purpose of the present proceeding is to establish Wallace & Gale's rights in the policies, hence the framework within which coverage of individual claims will be determined.[4]

B) With one exception, the parties agree that, with regard to claims arising out of injuries sustained while Wallace & Gale was actively involved in its operations installing asbestos, the policies have no limit of coverage.[5] The Intervenors contend,

---

4. The Intervenors and Travelers have entered into several important stipulations, including a Stipulation Concerning Medical Issues (Appendix B hereto) and a Stipulation Regarding Various Issues, Defenses and Damages (Appendix C hereto). In addition, the parties have entered into stipulations regarding the nonapplicability of various potential defenses (Appendix D hereto). Except for Granite State and New Hampshire, the Insurers have stipulated that they will not contend that Wallace & Gale "expected or intended" any of the injuries alleged by individuals asserting asbestos-related bodily injury claims. Similarly, again with the exception of Granite State and New Hampshire, the Insurers have stipulated that they will not contend that Wallace & Gale's insurance coverage is barred, limited, excluded or impaired because an individual's asbestos-related injury constituted a "known loss" or a "loss in progress." The Insurers have also either stipulated that they will not contend or do not in fact contend that any "pollution exclusion" clause applies to bar or limit coverage. Id. In short, many of the coverage defenses that the Insurers raised in their summary judgment motions on the duty to defend are not issues in this indemnification phase of the case.

5. The sole exception is Granite State, which claims aggregate limits for all claims, operations-related as well as completed operations claims. See Chart, Appendix A hereto.

moreover, that if a claimant was initially exposed to the asbestos while Wallace & Gale was still on the job, the insurer whose policy was in place at that time and each insurer thereafter is jointly and severally liable for all sums Wallace & Gale may be found liable to pay. The Insurers' response is that, at most, they are liable for a pro-rata share of the total liability based on the time each insurer was on the risk. The consequence of this distinction is that, if liability is pro-rated, no coverage will be available for any period in which Wallace & Gale had no policy in effect, and the pro-rata share of each insurer will be reduced *pro tanto*.

The Insurers also argue that, to the extent that claims pertain to any policy period after Wallace & Gale completed its operations, those claims are subject to an aggregate limit by reason of the completed operations hazards definitions of the policies. The Intervenors respond that so long as an injury—including exposure—occurred during Wallace & Gale's operations, it remains an operations claim thereafter, with no limit in coverage; it cannot be converted in whole or part into a completed operations claim subject to an aggregate limit.

Travelers, Granite State and New Hampshire raise additional issues unique to their own circumstances.

Travelers contends that the Intervenors have failed to produce Wallace & Gale's 1962–65 policies and have failed to present sufficient evidence of either the fact of loss or the terms and conditions and scope of coverage under the policies. The Intervenors argue to the contrary. Granite State and New Hampshire assert that Wallace & Gale expected or intended the asbestos-related injuries and claims when it purchased their policies for the 1984–85 period and, as such, they are excluded from coverage by reason of the "expected or in-tended" clauses of their respective policies. The Intervenors' response is that there is no evidence that Wallace & Gale actually expected or intended specific injuries at the time it bought either policy and, there-fore, the exclusion does not apply. The Intervenors also deny the applicability of the "known loss" doctrine, a closely related defense.

## III.

The parties have filed cross-motions for summary judgment. All agree that the principal issues before the Court—the allo-cation, aggregate, and expected or intend-ed loss issues—are appropriate for deci-sion as a matter of law. *See CSX Trans. Inc. v. Continental Ins. Co.*, 343 Md. 216, 680 A.2d 1082 (1996); *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995).

Summary judgment with regard to the missing Travelers policies covering the pe-riod 1962–62, on the other hand, is subject to the usual test of Fed.R.Civ.P. 56, *i.e.*, whether there exists a genuine issue of material fact. *See Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 698 A.2d 1167, 1177 (1997). When faced with a motion for summary judg-ment, the nonmoving party cannot simply rely on the allegations of its pleadings, but must produce "specific facts showing that there is a genuine issue for trial." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must come forward with evidence that proves more than some "metaphysical doubt" that genuine and material factual issues exist; a mere scin-tilla of evidence presented by that party is insufficient to defeat the motion. *Austin*

*v. Clark Equipment Co.*, 48 F.3d 833, 836 (4th Cir.1995).

### IV.

■ Since resolution of the issues raised by the parties involves the interpretation of insurance policies, the Court begins with a brief review of the applicable legal principles. Insurance policies are essentially contracts and as such the usual principles of contract law apply. *Sullins*, 667 A.2d at 619. The ultimate objective of policy interpretation is to ascertain the intention of the parties. *Id.* Unless the parties intend otherwise, words are given their customary, ordinary, and accepted meaning, which is to say the meaning they would be given by a reasonably prudent layperson. *Id.* If the language of the policy is clear and unambiguous, the policy will be interpreted within its four corners. *Id.* If ambiguity exists, parol evidence may be considered. *Id.* Although Maryland does not embrace the principle that ambiguity is to be construed against the insurer *qua* insurer, *see Cheney v. Bell National Life*, 315 Md. 761, 556 A.2d 1135, 1138 (1989), it does hold, according to the rule of contract law in general, that ambiguities will be construed against the drafter. *Sullins*, 667 A.2d at 619. Accordingly, Mary-

land law provides that ambiguities may be construed against the insurer *qua* drafter. *Id.*

■ In an action on an insurance policy, the plaintiff has the burden of proving every fact essential to his or her right to recover. *North Am. Acc. Ins. Co. v. Plummer*, 167 Md. 670, 176 A. 466, 469 (1935). The insurer has the burden of proving any exclusions under the policy. *National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 824 (4th Cir.1998). The burden of proof is by a preponderance of the evidence, *see* 10 Couch on Insurance, § 143:84 (3d ed. 2000), except insofar as lost policies are concerned. As to these, Maryland law provides that the proponent must establish the fact of loss and the terms and conditions of the policies by "clear and positive" evidence. *Barranco v. Kostens*, 189 Md. 94, 54 A.2d 326, 328 (1947).[6]

### V.

■ The Intervenors argue that each insurer should be fully responsible for Wallace & Gale's liability for bodily claims up to the limits of each policy. The Insurers argue that they should be liable for no more than a pro-rata share of total damages over the 1962–1985 period, measured

---

**6.** It is not certain that this standard is the equivalent of "clear and convincing evidence," a standard of proof that Maryland courts are quite familiar with and have employed on many occasions. *See, e.g., Dorsey v. Dorsey*, 302 Md. 312, 487 A.2d 1181, 1184 (1985) (stating that the burden is on the donee to establish every element of a gift by "clear and convincing evidence"); *In re Abigail C.*, 138 Md.App. 570, 772 A.2d 1277, 1288 (2001) (applying "clear and convincing evidence" standard to determination of whether termination of parental rights was in child's best interest). Courts in other jurisdictions have adopted the "clear and convincing" standard in addressing proof. of the terms of lost or missing insurance policies. *See, e.g., Maryland Cas. Co. v. W.R. Grace &*

*Co.*, 1995 WL 562179, *2 (S.D.N.Y.) ("A party seeking to recover under lost insurance policy 'must prove its former existence, execution, delivery and contents by clear, satisfactory and convincing evidence.' ") (citation omitted). Other courts have applied a preponderance of the evidence standard. *See, e.g., Borough of Sayreville v. Bellefonte Ins. Co.*, 320 N.J.Super. 598, 728 A.2d 225, 226 (A.D.1998). The applicable standard in Maryland, therefore, may be either a preponderance standard, a clear and convincing standard, or something in between. However, even if the higher standard applies, the Court, as will be seen, concludes that the Intervenors have adduced evidence that satisfies that standard. *See* Part VII *infra.*

by each insurer's time on the risk. As previously indicated, the practical consequence of deciding that the pro-rata formula applies will be to allocate part of the loss to Wallace & Gale for any period in which it was uninsured.

The issue is one that has challenged many courts and is no less problematic in the present case.

The Court begins with the language of the policies which, as to each insurer, is essentially the same. The following from Travelers' policies is typical:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies caused by an occurrence.[7]

The Intervenors' argument proceeds thus: The policies indemnify Wallace & Gale against liability to third parties. Once a policy is triggered, i.e., by an occurrence that takes place at least in part during the policy period, the insurer promises to pay "all sums" that the insured becomes legally obligated to pay as damages. It is the insured's liability that determines the extent of the insurer's obligation to pay, not the amount of bodily injury that occurs during the policy period. The Intervenors distinguish between "trigger" and "scope" under the policies. "Trigger" refers to the circumstance that causes a policy to be available for consideration of whether or not there is coverage; "scope" refers to the extent of coverage once a policy is triggered. For the Intervenors, the key is the "trigger."

The Intervenors continue: Nowhere do the policies the Insurers sold to Wallace & Gale provide that when multiple policies are triggered by the same claims, the amount of indemnity available will be limited or reduced by allocating some of the claimant's damages to other policies or other years. Had the Insurers intended to limit their liability to a pro rata share of the damages, they could have easily said so in express language instead of using language requiring them to pay "all sums."

The Insurers see things quite differently. They insist that, according to the clear language of the policies, each affords coverage only for injuries that occurred during a given policy period. Travelers points out, for example, that in each of its 1967 through 1973 policies, the policy states that it "applies only to bodily injury . . . which occurs during the policy period." Similarly, in policies between 1974 and 1984, the term "bodily injury" is defined as injury "which occurs during the policy period." As a result, says Travelers, the "all sums" covered by the policies are not, as the Intervenors suggest, "all sums" whatsoever, but only "all sums" payable because of bodily injury "which occurs during the policy period."

Deferring for a moment the question of whether the policy language is sufficiently unambiguous as to dictate a result one way or another, the Court considers such Maryland law as applies to the issue.

---

7. The relevant language varies somewhat from insurer to insurer and even as to the same insurer. The policies issued by Travelers to Wallace & Gale from 1967 through 1973, for example, define the scope of coverage as follows: "This insurance applies only to bodily injury or property damage which occurs during the policy period." Its policies issued from 1974 through 1984 define "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

The Travelers' policy issued in 1966 is in a different form, but the effect is the same.

Both the Intervenors and the Insurers cite the same cases, but give them significantly different readings. The case most debated by the parties is *Bausch & Lomb v. Utica Mutual Ins. Co.*, 355 Md. 566, 735 A.2d 1081 (1999). The Insurers contend that *Bausch & Lomb* clearly rejected "all sums" allocation in progressive injury cases. The Intervenors insist that *Bausch & Lomb* took no position on the viability of the theory.

In *Bausch & Lomb*, which involved hazardous waste materials, the issue was whether a CGL insurer was responsible for expenses incurred by its insured in removing those materials from the insured's premises. One of the issues the circuit court considered was whether the insured was required to prove the precise portion of the damage that occurred in each of the years 1982, 1983, 1984 and 1985. As later characterized by the Maryland Court of Appeals, "[a]lthough the [circuit] court stated that the technology to prove damages with specificity was unavailable, it held that [the insured] was entitled to the full first party coverage under the 1982 to 1985 policies because some damage occurred during each covered policy period." *Id.* at 1087. The Court of Special Appeals reversed the circuit court, holding "that it was 'premature for the circuit court to award the policy limits,' because the 'precise amount of damages that 'occurred' for each policy year at issue cannot be resolved on the record in this case.'" *Id.*

In the Court of Appeals the insured argued that the Court of Special Appeals had erred in ruling that the amount of damage for each policy year had to be determined. *Id.* at 1091. The insured maintained that its insurer had promised to pay all sums which the insured suffered as damages by reason of covered events. *Id.* This language did not mean, said the

insured, that the insurer would only pay for a "quantifiable portion" of property damage taking place during the applicable policy period; therefore, so long as the property damage took place at least in part during a policy period, it was irrelevant to the insurer's liability if the property damage also took place in part during another policy period. *Id.*

The Court of Appeals held that the intermediate appeals court had correctly determined that the record in the case was inadequate on the issue of proof of damages, stating "the record before us contains no evidence on the amount of environmental property damage to Bausch & Lomb's own property during the applicable period." *Id.* at 1093. The court thereupon remanded the case to the Circuit Court, but with the following observation:

Unless and until there is evidence supporting a finding that the technology is unavailable to determine the amount of damage during the period covered by the policies containing [the endorsement], it would be premature for this Court to explore the legal consequences of such a finding under the circumstances of this case. Upon remand to the circuit court, the parties should be given the opportunity to introduce evidence as to these matters.

*Id.* at 1093–94.

This Court agrees with the Intervenors, particularly in light of the last quotation, that the Maryland Court of Appeals did not, as the Insurers in the present case suggest, categorically reject the "all sums" argument in cases of progressive injury such as the one at bar. To the contrary, the quotation shows that the Court of Appeals expressly declined to make any determination in that regard so long as there was no evidence that the technology was unavailable to determine the amount of damage occurring during the period cov-

ered by the policies in question. In the present case, however, the parties have stipulated that the technology is in fact unavailable to determine the amount of asbestos-related damage that occurred during the periods covered by the policies in question. *Bausch & Lomb*, therefore, sheds little light on the outcome where discrete amounts of damage cannot be proved.

It remains for the Court to determine what method of allocation should apply in that circumstance.

Travelers cites the Fourth Circuit case of *Spartan Petroleum Co. Inc. v. Federated Mutual Ins. Co.*, construing South Carolina law, for the proposition that pro rata allocation is appropriate. 162 F.3d 805 (4th Cir.1998). The Insurers believe *Spartan* controls because, they say, "Maryland law, like South Carolina law, adopts the injury-in-fact trigger based on the language of the general liability policy providing that the policy responds only to injury during the policy period." The Intervenors argue that *Spartan* is distinguishable.

*Spartan*, like *Bausch & Lomb*, dealt with pollutants in the soil, specifically claims against an insured by adjoining property owners to whose property leaking fuel had migrated. The Fourth Circuit concluded that:

> under South Carolina law, in cases involving a standard CGL policy and progressive damage affecting multiple properties, the injury-in-fact trigger requires an insured to demonstrate that during the policy period an injury caused by the underlying 'occurrence,' occurred to the property that is the subject of the underlying third-party action.

*Id.* at 810–11. It found further that, "[o]nce an injury-in-fact has triggered coverage as to *that* property, coverage is triggered 'continuously thereafter to allow coverage under all policies in effect from

the time of injury-in-fact during the progressive damage' to that property." *Id.* at 811 (emphasis in original) (quoting *Joe Harden Builders, Inc. v. Aetna Cas. and Surety Co.*, 326 S.C. 231, 486 S.E.2d 89, 91 (1997)).

Because the policy in question was silent on the issue of allocation and the court could find no authoritative South Carolina law on the subject, *Spartan*, 162 F.3d at 812, it opted to follow those courts that had concluded that the injury-in-fact/continuous trigger "requires both pro rata allocation and allocation to the insured for any periods of the progressive damage during which it was self-insured." *Id.*

The court found pro rata liability to be the "logical corollary" of the injury-in-fact/continuous trigger. *Id.* It found support for this holding in *Joe Harden*, in which the South Carolina Supreme Court had applied the injury-in-fact/continuous trigger and allowed for allocation among the insurance policies triggered. *See Joe Harden*, 486 S.E.2d at 91.

The Intervenors distinguish *Spartan* from the present case and so does the Court.

In the first place, according to the classifications *Spartan* itself recites, Maryland does not fall into the injury-in-fact category:

> In *Joe Harden*, the South Carolina Supreme Court answered the question of when 'property damage' or 'bodily injury' occurs under the standard CGL policy in cases involving progressive damages, such as ... asbestosis. Courts nationwide have struggled with this question, since the times of the injury-causing event (such as ... exposure to asbestos), the injury itself, and the injury's discovery or manifestation can be so far apart. The *Joe Harden* court, emphasizing the policy's requirement that

the property damage 'occur [ ] during the policy period' chose the second of these three points, but added that the damage can continue over several policy periods, thus triggering more than one policy:

> [C]overage is triggered when the damage can be shown in fact to have first occurred, even if it is before the damage became apparent, and the policy in effect at the time of the injury-in-fact covers all the ensuing damages.
>
> ... This is the 'injury-in-fact/continuous' trigger, which we will refer to as simply the 'injury-in-fact' trigger.

*Id.* at 808 (internal citations omitted).[8]

■ Maryland, in marked contrast to South Carolina, is a "multiple trigger" jurisdiction. As the Maryland Court of Appeals noted in *Mitchell v. Maryland Cas. Co.:*

> Considering the plain meaning of the term 'bodily injury,' as used in the policy, and in light of the medical evidence concerning the development of asbestos-related diseases, we align ourselves with the overwhelming authority in the country and conclude that 'bodily injury' occurs when asbestos is inhaled and retained in the lungs ... Accordingly, we hold that the trial judge erred in adopting, as the *sole* trigger of coverage, the 'manifestation' theory of coverage, namely, that coverage is not afforded until harm actually becomes manifest.

324 Md. 44, 595 A.2d 469, 478 (1991) (emphasis in original).

■ In finding the injury-in-fact trigger consistent with the requirement that the damage occur during the policy period, the *Spartan* court—following South Carolina's view—assumed that a precise injury could be identified during a given policy period. The multiple trigger theory, however, rejects that assumption and emphatically does not require the insured to demonstrate that a precise injury occurred during a given policy period. Instead of focusing on a particular policy period, it considers the injurious event as a continuum.[9]

*Spartan*'s analysis of the facts before it underscores this distinction.

The Fourth Circuit panel found that the trial court had erred in combining the injury that occurred on the insured's prop-

---

**8.** *See also Johnson v. Studyvin,* 828 F.Supp. 877, 881 (D.Kan.1993):

> There have been a number of legal theories which attempt to set forth, for purposes of insurance contract interpretation, when a bodily injury occurs in connection with a person's exposure to a hazardous substance such as asbestos. These include the theories that individuals are injured (1) when they are first exposed to the hazardous substance ... (2) when they manifest symptoms of their injury or disease resulting from exposure to the hazardous substance, ... (3) when actual injury occurs ... (4) or any time when one of these three events occurs. (internal citations omitted).

**9.** *J.H. France Refractories Co. v. Allstate Ins. Co.,* offers a detailed explanation of the theory:

> The medical evidence in this case unequivocally establishes that injuries occur during the development of asbestosis immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify [the insured] under the terms of the policy ... Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury.

534 Pa. 29, 626 A.2d 502, 507 (1993).

erty, *i.e.,* the fuel leak, and the injury that occurred when the leak migrated to adjoining properties. It found no injury to the adjoining properties until such time as the migration was established. But in the present case, the fact that Maryland recognizes that coverage is multiply triggered, beginning with exposure to asbestos-containing materials, is more analogous to the time when the fuel leak described in *Spartan* first occurred than the time when injury-in-fact could be established.

Indeed, the *Spartan* court contrasts the case before it with the case of *New Castle County v. Continental Cas. Co.,* 725 F.Supp. 800 (D.Del.1989), *aff'd in part, rev'd in part,* 933 F.2d 1162 (3rd Cir.1991), which "reject(ed) the injury-in-fact trigger of *Joe Harden.*" *Spartan,* 162 F.3d at 810. In *New Castle County,* which also involved the leaching of pollutants from a landfill to adjacent land, the Delaware court had adopted a "continuous trigger," beginning when the "injurious process leading to the property damage commenced." 725 F.Supp. at 812. In the words of the Fourth Circuit, by this the Delaware court "meant the date when any contaminant began leaking from the landfill" because " 'it would be impossible ... to determine when the first molecule of contaminant damaged neighboring property.' " *Spartan,* 162 F.3d at 810 (quoting *New Castle,* 725 F.Supp. at 812). *"Unlike these courts,"* wrote the Fourth Circuit, *"we are not free to consider these policy arguments."* *Spartan,* 162 F.3d at 810 (emphasis added). Significantly, the *New Castle County* court subsequently went on to hold that there would be no proration of losses under a policy once coverage was triggered. *New Castle County,* 725 F.Supp. at 817. "An insurance company's liability to an insured," the *New Castle County* court said, "is contractual. The terms of the contract are not affected by prior or subsequent coverage." *Id.*

Thus, as to proration, whereas *Spartan* suggests that the injury-in-fact/continuous trigger theory compels it, at least in fuel leak cases, it is by no means clear that the multiple trigger theory in asbestos-injury cases does likewise. In fact, courts that have adopted the "continuous" or "multiple" trigger for injury in such cases, have usually followed the "all sums" approach. The seminal case is *Keene Corp. v. Ins. Co. of North America,* where the D.C. Circuit explained:

> [E]ach policy has a built-in trigger of coverage. Once triggered, each policy covers [the insured's] liability period. There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover [the insured's] entire liability once they are triggered.

667 F.2d 1034, 1048 (D.C.Cir.1981); *see also J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502, 507 (1993) ("Under any given policy, the insurer contracted to pay *all sums* which the insured becomes legally obligated to pay, not merely some pro rata portion thereof.") (emphasis in original); *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995); *Koppers Co. v. Aetna Cas. & Surety Co.,* 98 F.3d 1440, 1450 (3rd Cir. 1996).

Maryland has yet to speak definitively to the question, straddling in a sense, since in *Mitchell* it cited both *Keene* (which did not pro rate) and [*Insurance Co. of North America v.*] *48 Insulations[, Inc.,* 633 F.2d 1212 (6th Cir.1980)] (which did). 595 A.2d at 477. But, in the Court's view, in the end it comes to this. To the extent that both the Intervenors and the Insurers have given reasonable readings to the language of the policies—and the Court will

accept for present purposes that that is the most favorable view that can be given to the Insurers' argument—then the "tie," as the Intervenors put it, goes to the insured. *Sullins,* 667 A.2d at 619.

The fact remains that there is no explicit or unambiguous policy provision allowing the Insurers to allocate the loss so as to deprive the policyholder of full coverage. *See Keene,* 667 F.2d at 1049 ("For an insurer to be only partially liable for an injury that occurred, in part, during its policy period would deprive [the insured] of insurance coverage for which it paid. With each policy, [the insured] paid for insurance against *all liability* for bodily injury.") (emphasis added). Since the words "pro rata" are not found in the insurance contract, any apportionment would have to be simply imposed on the parties, which is why, as the Intervenors point out, Travelers' expert called the pro rata approach "somewhat of a rough and ready way of dealing with" the issue.

Indeed there is nothing in the policies that suggests that the insured might have to absorb all or any part of liability for a covered claim. Had the Insurers wanted to, they could easily have included a provision for proration of liability when more than one policy was triggered. *See Monsanto,* 652 A.2d at 35 ("The majority of courts have held that without a *pro rata* clause in their policies, the insurance companies cannot limit their obligations to a *pro rata* share or portion of [the insured's] liabilities."). For example, insofar as "other insurance" clauses are concerned, *i.e.,* those meant to reduce the insurer's liability when more than one insurer is on the risk at a given time, the Insurers certainly knew how to craft such limitations.

Finally, the Court agrees that the "all sums" approach is more realistic in light of Wallace & Gale's exposure in the underlying tort cases. Presumably, Wallace & Gale could be held jointly and severally liable for the entirety of a claimant's injury as a result of a single exposure, even if it turns out that the claimant has had other exposures at other times related to work for other companies. The objective in the present case is simply for Wallace & Gale to pass on its potential joint and several liability to its CGL insurers. *See Keene,* 667 F.2d at 1044 n. 20.

Accordingly, the Court holds that if a claimant was initially exposed to asbestos while Wallace & Gale was on the job, the insurer whose policy was in place at that time and each insurer thereafter will be obliged to pay "all sums" Wallace & Gale becomes legally obligated to pay to that claimant as damages. Consequently, there will be no pro rata allocation nor any allocation to Wallace & Gale for any period of the progressive damage during which it may have lacked insurance. *See Armstrong,* 52 Cal.Rptr.2d at 711 ("[O]nce coverage is triggered, the insurer's obligation to the policyholder is to cover the policyholder's liability 'in full' up to the policy limits ... The logical consequence of this ruling is that the policyholder is covered ... for the full extent of its liability and need not pay a pro rata share.").[10]

---

**10.** The Court's conclusion on this point "does not alter the rules of contribution or the provisions of 'other insurance' clauses in the applicable policies. There is no bar against an insurer obtaining a share of indemnification or defense costs from other insurers under 'other insurance' clauses or under the equitable doctrine of contribution." *J.H. France,* 626 A.2d at 509. Indeed, the Inter-

venors acknowledge this in their briefs. However, it is important to note that apportionment among multiple insurers "has no bearing upon the obligations of the insurers to the insured." *Armstrong,* 52 Cal.Rptr.2d at 711. *See also Monsanto Co. v. C.E. Heath Compensation & Liability Ins. Co.,* 652 A.2d 30, 35 n. 8 (Del.1994) (noting that any subsequent inter-insurer apportionment has "no

## VI.

The Insurers also argue that any injuries that occurred after Wallace & Gale's operations were completed fall within the "completed operations hazard" clauses of their policies and, as a result, that any coverage that may be due because of those injuries is subject to aggregate limits, as provided in the policies. The Intervenors contend that, with limited exceptions, the policies contain no aggregate limits for claims that first arise out of Wallace & Gale's operations, even if the policies cover subsequent periods.

The Court considers the relevant language of the policies. Hartford's policies are typical. They provide a single aggregate limit for damages because of bodily injury that meets either the "completed operations hazard" or "product hazard" definition:

> Subject to the above provision respecting "each occurrence," the total liability of [Hartford] for all damages because of (1) all bodily injury included within the complete operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the schedule as "aggregate." [*i.e.* $500,000]

The policies define the "completed operations hazard" in pertinent part as follows:

> **"completed operations** hazard" includes bodily injury ... arising out of operations ... but only if the bodily injury

.... occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.[11]

"Bodily injury" is defined as:

> bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

The policies of other insurers are substantially identical in all material respects.

Parsing the "completed operations hazard" definition, it is clear that three elements are involved. There must be bodily injury during the policy period that (1) arises out of Wallace & Gale's operations; (2) occurs away from premises owned by or rented to Wallace & Gale; and (3) occurs after these operations have been completed. The parties agree that elements (1) and (2) obtain. All claims arise out of Wallace & Gale's installation operations and all injuries will have occurred away from premises owned by or rented to Wallace & Gale, *e.g.*, at the Bethlehem Steel Sparrows Point Plant. The sole inquiry, insofar as this issue is concerned, is whether the bodily injury occurred after Wallace & Gale's installation operations were completed.

In answering this inquiry, it is important to focus precisely upon what the Intervenors are claiming. They maintain that the vast majority of claimants were injured when they were exposed to respirable as-

---

bearing upon the insurers' obligations to their policyholder" who has already been made whole).

11. The policies define "product hazard" thus: "**product hazard**" includes bodily injury ... arising out of the named insured's products ... but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

The Intervenors agree that asbestos-related bodily injuries arising out of Wallace & Gale's sale and distribution of asbestos products would meet the "product hazard" definition and for that reason would fall within the product hazard aggregate limit. The Court does not understand that the number of claimants proceeding on the basis of product hazard will be appreciable.

bestos fibers *during* Wallace & Gale's installation· work. While they concede that these claimants continued to suffer progressive injury after their initial exposure, they argue that the injuries must still be deemed to have occurred while Wallace & Gale was in the process of installing asbestos, not from any events that occurred after its operations were completed.

The Insurers, on the other hand, argue that because the scope of coverage afforded by each policy is limited to bodily injury that occurs during the respective policy period, the bodily injury referred to in the "completed operations hazard" definition is necessarily the specific bodily injury that occurred during the policy period. Thus, if the bodily injury that occurs within the policy period "occurs after [the insurer's] operations have been completed . . .," that bodily injury is within the completed operations hazard. The Insurers challenge the Intervenors' argument that, if initial exposure to asbestos occurred during operations, no portion of a claim alleging that sort of exposure can come within the completed operations hazard thereafter. As Travelers puts it, application of the completed operations hazard depends exclusively on the timing of the injury in relation to the completion of the insured's operations.[12]

The Court agrees with the Insurers.

Initially, it is useful to distinguish between the Insurers' duty to defend and their duty to indemnify. Maryland law and the stipulations of the parties become relevant in this regard. Maryland courts have held that asbestos-related injury begins with exposure, carries forward while the asbestos fibers are in residence and continues through to manifestation of the disease. The parties, moreover, have stipulated that it cannot be said with certainty when injury actually occurs or to what degree. Quite possibly, therefore, actual injury could occur in whole or part during any one or more policy periods, including those coming after Wallace & Gale completed its operations. Indeed it was precisely for that reason that Court held earlier that every insurer had a duty to defend in this case.

But this same postulate does not lead to uniformity of treatment in the context of the aggregate limit argument. It remains true that asbestos-related injury can occur at any time from exposure onward and that it cannot be said with certainty when or to what extent it actually occurs. But whatever injury-theoretical or real-is assumed to have occurred after Wallace and Gale's operations were completed will always-by definition-be covered by the completed operations clause. The injury occurs after operations were completed. Nor does it matter whether an injury is viewed as occurring both upon initial exposure before operations are completed as well as thereafter. The portion of the injury extending beyond completion would still, by definition, occur post-operations and thus remain subject to the completed operations hazard aggregate limit.

By the same token—to the extent that injuries, beginning with exposure, may be considered as occurring before operations were completed they would, by definition, be excluded from the completed operations

---

**12.** The Intervenors do not appear to be arguing, as Travelers suggests, that liability depends on when the event that caused the injury occurred, i.e., when the asbestos installation took place. As indicated, the Court understands the Intervenors to be arguing as to the vast majority of claimants that they sustained their injury giving rise to liability, *i.e.,* exposure to asbestos, while Wallace & Gale was still actively installing the asbestos containing materials.

clause. There would be no aggregate limit under the policies then in effect.

Case law is not inconsistent with this view.

*Porter Hayden,* although involving a slightly different factual scenario from that present here, is illustrative. 116 Md.App. 605, 698 A.2d 1167. In *Porter Hayden* an installer of insulation containing asbestos sought declaratory judgment that its CGL insurer had a duty to defend and indemnify it in connection with product liability suits brought by workers.[13] One of the issues on appeal was whether the trial judge had erred in determining that the insured enjoyed coverage for the claims since the policies restricted coverage for third party bodily injuries to those occurring during the insured's operations, *i.e.,* it provided "premises-operations" coverage only. The insurer argued that the asbestos-related claims were essentially product liability claims and as such would only have been covered if additional "products hazard" coverage had been purchased, which the insured conceded was not the case. The Court of Special Appeals noted that the only issue with which it was concerned at the duty to defend stage was whether it was *possible* that an injury occurred as a result of the insured's installation operation while it still had control of a particular premises. *Id.* at 1207. If so, the insurer would have a duty to defend. On the other hand, whether the insurer had a duty to indemnify would have to await trial on the merits. *Id.*

The court observed:

From [ ] selected portions of the Master Complaint, it is evident that [the insured] could be held liable for the manner in which it conducted *its operations in installing* the asbestos-containing products. In that light, it is not solely covered by the 'Products Hazard' insurance it declined to purchase.

\*     \*     \*     \*     \*     \*

The 'Products Hazard' insurance is concerned with injury occurring after possession of the goods or the product has been relinquished or the operation has been completed or abandoned. The nature of some of the allegations in the Master Complaint, however, concern exposure and injury occurring during the operation, such as the emission of asbestos dust during the installation process.

*Id.* at 1209 (emphasis in original).

There are some obvious dissimilarities between *Porter Hayden* and the present case. *Porter Hayden* involved policies of a single insurer that were in effect during the insured's asbestos insulation operations, *i.e.,* before the operations were completed, whereas the policies of several insurers are involved here, some of which were in place after Wallace & Gale ceased operations. Further, *Porter Hayden* considered the products hazard (as opposed to the completed operations hazards) issue under policies with an exclusion, whereas the policies in the present case provide completed operations coverage up to aggregate limits. A further distinction of course is that the court in *Porter Hayden* was deciding the duty to defend issue, not the duty to indemnify.

But these differences do not diminish *Porter Hayden*'s relevance to the issue at hand.

The clear thrust of the quoted language, albeit dicta, is that an insurer's duty to indemnify will be limited (in *Porter Hayden* there would be none, here there would

---

**13.** Coincidentally, the insured had installed asbestos insulation at the Bethlehem Steel Plant at Sparrows Point.

be an aggregate) if the injury is found to have occurred wholly after the insured has relinquished control of the premises.

Moreover, the implication of the language is that, while the "products hazard" provision (and by analogy the completed operations hazard provision) will not "solely" limit coverage where injury during operations is also alleged, it may still limit coverage in part. In other words—contrary to the argument of the Intervenors— once an operations claim, *not* always an operations claim.[14]

The parties set much store by *Johnson v. Studyvin*, another case involving an installer of asbestos-containing products. 828 F.Supp. 877 (D.Kan.1993). In that case, in 1977, the installer installed a spray-on, asbestos-containing textured ceiling in a house and in 1990 a subsequent owner of the house discovered that the ceiling texture contained the asbestos. Alleging both bodily injury and property damage, the subsequent owner sued the contractor, which sought coverage under the policies of a former insurer. The policies in effect after the installation was completed, i.e., from 1981 to 1984, contained a completed operations exclusion based on a definition comparable to those found in the present case.

The Kansas court reviewed the various theories of when bodily injury occurs in connection with a person's exposure to a hazardous substance such as asbestos.[15]

It further noted that under any of the theories, there could be no bodily injury until a person was at least exposed to the hazardous substance. Accordingly, since the earliest that the claimant could have been exposed to asbestos in his home was when he acquired it in 1985, well after completion of the contractor's operations, there could be no coverage for bodily injury claims resulting from exposure to the asbestos. *Id.* at 881–82.

In addition, with respect to one of the applicable policies there was a completed operations hazard clause which the court held excluded coverage for liability for property damage. This was "[b]ecause the operation of applying the ceiling texture was completed and the product, *i.e.* asbestos-containing ceiling texture, left [the insured's] possession long before any [relevant] insurance was issued to the [the insured] . . . ." *Id.* at 884.

The Insurers in the present case argue that *Johnson* stands for the proposition that, while some asbestos-related injury may occur while operations are underway, any later injury that triggers coverage in policy years after operations have been completed falls within the "completed operations hazard" definition of a post-installation policy.

The Intervenors contend that this reads too much into the case. The Kansas court, they say, was not confronted with the issue of whether the same individual who was

<hr/>

**14.** The Court agrees with Hartford and St. Paul that the Intervenors' reference to *Porter Hayden's* holding regarding the "per person" limit under insurance policies is irrelevant. *Porter Hayden* found that each claimant who is injured by exposure to asbestos constitutes a separate "occurrence" under the policy, rejecting the suggestion that installation of the asbestos-containing materials constitutes a single "occurrence." 698 A.2d at 1210–11. As the *Porter Hayden* court recognized, the single "occurrence" view could have "the practical effect of establishing an aggregate

coverage limit for an entire policy." *Id.* at 1210. However, as Hartford and St. Paul point out, the "per occurrence" limit has no bearing on the issue before this Court, because the separate and distinct completed operations aggregate limit can apply to all injuries meeting the completed operations hazard definition, regardless of the number of occurrences giving rise to the claims.

**15.** See n. 8.

claiming injury from exposure during the installation process was also claiming continuous injury after the operations had terminated. *Johnson* arguably stands for no more remarkable a proposition than that an insurer in an asbestos-related injury case cannot be held liable for bodily injuries before a claimant is at least exposed to asbestos (nor for property damage that occurs and is complete, *i.e.*, non-progressive, before a policy comes into effect).

But the Court does not see these positions as inconsistent. Suggesting, as the Intervenors do, that a claimant must be exposed to asbestos before there can be liability in no way conflicts with the proposition that injury (beginning with exposure) can occur either before or after operations are complete and that different aggregate limits might apply to the two circumstances. And that, for the reasons stated earlier, is precisely how the Court views the matter.

If a claimant's initial exposure occurred while Wallace & Gale was still conducting operations, policies in effect at that time will not be subject to any aggregate limit. If, however, initial exposure is shown to have occurred after operations were concluded or if exposure that began during operations continued after operations were complete, then the aggregate limits of any policy that came into effect after operations were complete will apply. Where a given claimant falls within this framework will have to be considered on a case-by-case basis.

## VII.

■ Travelers has moved for summary judgment with regard to the insurance policies Wallace & Gale claims it was issued between 1962 and 1965.[16]

Although the 14 policies issued to Wallace & Gale between 1966 to 1979 have never been located, Travelers has stipulated to their existence as well as to pertinent policy forms, endorsements, terms, conditions and limits of liability for those policies. No such stipulation, however, has been entered into with regard to the policies covering the years 1962 through 1965. Travelers argues that the Intervenors have not produced the actual policies nor have they proved that the policies are lost and/or the terms, conditions, and scope of coverage of the policies, such that Travelers is entitled to summary judgment as to any action based on those policies. The Intervenors contend that they have presented appropriate proof of both the loss of the policies and all pertinent policy features.

■ Under Maryland law, the language of the policy determines its terms, conditions and scope of coverage. *See Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 702 A.2d 767, 771 (1997). Ordinarily, therefore, one seeking coverage under an insurance policy must produce the original of the policy. *See* Fed.R.Evid. 1002 (to prove content of writing, original writing is required except as otherwise provided in these rules by act of Congress). If the

---

**16.** The Intervenors' Motion for Summary Judgment does not cover the issue of lost policies. As to this, the Intervenors have merely filed an opposition to Travelers' Motion for Summary Judgment. The Court, however, has inherent authority to grant summary judgment *sua sponte* under certain circumstances and, as will be seen, does so in favor of the Intervenors on the issue of the

lost policies. *Celotex*, 477 U.S. at 326, 106 S.Ct. 2548. Because Travelers itself moved for summary judgment on the issue and presented its argument in full, there is no requirement of prior notice that the Court might act *sua sponte*. *Cf. U.S. Development Corp. v. Peoples Federal Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir.1989).

original has been lost or destroyed, however, the terms of the writing may be proved by other evidence. *See* Fed.R.Evid. 1004. The burden of proof is considered substantive and not merely procedural; therefore the quantum of proof necessary to meet that burden is governed by state law. *See New Hampshire Ball Bearings v. Aetna Cas.,* 848 F.Supp. 1082, 1089 (D.N.H.1994), *rev'd in part on other grounds,* 43 F.3d 749 (1st Cir.1995) (stating that "when the plaintiffs are suing under state and federal declaratory judgment law, the question of burden of proof will be governed by New Hampshire substantive law").

■■■ Under Maryland law, the proponent of a lost insurance policy has the burden of proving its terms and conditions by "clear and positive" evidence. *Barranco,* 54 A.2d at 328.[17]

The Intervenors concede that they have not produced the policies for the years in question, but contend that they expended considerable time and effort attempting to locate those policies. These efforts included the submission of comprehensive requests for production of documents to Wallace & Gale and specific discovery requests to Travelers itself, as well as attempts to locate Aetna-provided attorneys who defended Wallace & Gale in earlier asbestos cases and Wallace & Gale's former accountants and insurance agents, upon several of whom subpoenas were served. Moreover, Travelers' Rule 30(b)(6) designee on the issue of the 1962–65 policies, Clinton N. Greene, reviewed a collection of Aetna documents relative to those policies[18] and conceded that Aetna had in fact issued CGL policies to Wallace & Gale, which included bodily injury coverage, for the period January 1, 1962 through 1965.

As the Intervenors point out, that admission conclusively establishes that:

1) The 1962, 1963, 1964 and 1965 policies were issued by Aetna;

2) Wallace & Gale was the insured on these policies; and

3) The policies were in effect from January 1, 1962 through January 1, 1966.

The matter therefore needs little further comment. The evidence that CGL policies covering bodily injury claims were issued to Wallace & Gale between 1962 and 1965 is clear and positive and there is no evidence to the contrary. The Intervenors have established as a matter of law that the policies existed and were lost.

■■■ The proponent of a missing policy must also prove its key terms and conditions, including the basic terms of coverage and the coverage limits. *See Bituminous Cas. Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130, 1132–33 (5th Cir.1992), *abrogation on other grounds recognized by Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.,* 241 F.3d 396 (5th Cir.2001) (applying Texas law). Travelers says the Intervenors have not done this, the Intervenors say they have. The Court finds that the Intervenors are entitled to summary judgment on this aspect as well.

Travelers' designee Greene testified that the "1955" standard CGL form was the policy form Aetna used for CGL policies issued during the 1962–1965 time period and that the basic terms and conditions of the stipulated 1966 Aetna policy issued to Wallace & Gale were those comprising the "1955" form. Indeed, each of the 14 stipulated CGL policies Aetna issued to Wallace & Gale between 1966 and 1980 used the basic terms and conditions of the form of

---

**17.** See n. 6.

**18.** These consisted of evidence of policy numbers, retrospective premium worksheets, and

billings showing payment of liability premiums.

the National Bureau of Casualty Underwriters (NBCU) or that of its successor, the Insurance Service Organization (ISO).

In addition, the 1966 Aetna policy indicates that it is a "renewal" policy, further indicating that the 1962–1965 policies would have contained the same basic terms and conditions as the 1966 policy. Finally, the 1962–65 policies were included with the 1966–69 policies as part of the retrospective rating Aetna undertook for Wallace & Gale.

■ As opposed to this clear and positive evidence, Travelers has done little more than speculate that the policies may in fact have been different, offering no specifics demonstrating how this might be so. Such speculation cuts no ice. A party seeking or opposing summary judgment must do more than rest upon mere assertion to raise an issue of material fact. *See Austin,* 48 F.3d at 836. Since Travelers has not proceeded beyond mere assertion, its argument fails as a matter of law. The Court concludes that the Intervenors have established without contradiction that the terms and conditions of the 1962–65 Wallace & Gale policies were the same as those of the 1955 NBCU policy utilized by Aetna during this time period.

A few important distinctions are in order. This emphatically is not a case where the only evidence the proponent of the lost policy can produce is the standard policy in effect at the time for which coverage is sought. *Cf. USF & G Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139, 1172 (W.D.Mich.1988). Nor does the Court's decision in any way conflict with its earlier ruling in favor of Liberty Mutual Insurance Company regarding "lost" CGL policies that Liberty Mutual allegedly issued to Wallace & Gale prior to 1962. In sharp contrast to the testimony of Travelers' Rule 30(b)(6) designee that Aetna issued the 1962–65 policies, Liberty Mutual disputed that it ever issued any such policies to Wallace & Gale during the alleged time period. Moreover, in Liberty Mutual's case, there was no testimony in the record regarding the terms and conditions (much less the policy years) of the alleged policies. Here, the evidence (including documentary evidence) is extensive with regard to the fact of issuance of the policies to the named insured, the nature of the coverage (CGL including bodily injury claims), the policy periods, and the basic terms and conditions. Any comparison to Liberty Mutual is accordingly invalid.

■ There remains the matter of scope of coverage.

Travelers Rule 30(b)(6) witness Greene testified that the minimum policy limit on Aetna's CGL policies for the period in question was $5,000 per person and $10,000 per accident with no aggregate for general liability bodily injury claims, and $5,000 per accident and a $25,000 aggregate for products and completed operations claims. He further testified that the limits of the policies issued to Wallace & Gale for the years in question were definitely *higher* than these minimum limits, but was unable to determine the amount by which those policies exceeded the minimum limits. In contrast, the Intervenors' expert, Leonard Silver, testified that the most likely actual aggregate limit of the 1962–65 policies for products and completed operations claims was the same as the limits of the 1966 policy Aetna issued to Wallace & Gale, *i.e.,* one million dollars.

In view of this evidence, Travelers cannot seriously argue that it is entitled to summary judgment as to the scope of coverage. Its own expert has conceded the minimum coverages that were in effect for the years in question, indeed he conceded that the actual coverages were definitely higher than the minimums. Travelers'

"metaphysical doubt" as to what the upper limits of the policies might have been, *see Austin,* 48 F.3d at 836, cannot alter this concession, nor does it raise a genuine issue of material fact. The Intervenors are entitled to summary judgment that the scope of coverage under the policies in question is no less than the minimum policy limits for Aetna's CGL policies for the period in question.

On the other hand, while it is quite possible, even likely, that the aggregate limit for products/completed operations claims for the 1962–65 period was the same as for the 1966 period, *i.e.,* a million dollars, the Court need not decide that issue at this juncture. It is enough to say that determination of the higher limit of coverage can be resolved at a later time by the trier of fact.[19]

The Court will DENY Travelers' Motion for Summary Judgment as to the 1962–65 policies.

## VIII.

■■■■■ Granite State and New Hampshire ask for summary judgment on the ground that the Intervenors' bodily injuries were either "expected or intended" by Wallace & Gale or were "known losses" at the time the Insurers' policies were issued.[20]

The Granite State policy defines "occurrence" as:

> An accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.

The New Hampshire policy defines the term in similar fashion.

Granite State and New Hampshire allege that by the time their policies were purchased in September 1984, Wallace & Gale was well aware that asbestos-related bodily injury lawsuits had been and would continue to be brought against it. They cite extensively from the deposition of John Smith, Vice–President of Wallace & Gale's insulation department from 1967 until 1977 and its President from 1977 to 1989, who testified that Wallace & Gale stopped selling asbestos-containing products in the early 1970s because it knew as of that time that asbestos was harmful. Smith also acknowledged that workers compensation claims and lawsuits for asbestos-related bodily injury had begun to be filed against Wallace & Gale in the late 1970s and that by 1981 the number of such actions was "large." He confirmed that the continuing asbestos lawsuits were one of the reasons Wallace & Gale was forced to file for bankruptcy in 1984 and concluded by saying that he expected to continue to receive additional asbestos-related claims in the future. Granite State and New Hampshire cite several cases for the proposition that if an insured was aware that identical damages or identical claims had been asserted prior to the purchase of a policy, it will not be able to receive coverage for similar claims under the policy. *See, e.g., United States v. Conservation Chemical Co.,* 653 F.Supp. 152 (W.D.Mo.1986); *Township of Gloucester v. Maryland Cas. Co.,* 668 F.Supp. 394, 403 (D.N.J.1987).

---

**19.** To the extent Wallace & Gale was still engaged in installation of asbestos-containing materials between 1962 and 1965, the point would be academic, since the completed operations aggregate would not apply.

**20.** Because they are attempting to exclude coverage, Granite State and New Hampshire bear the burden of proving the exception to coverage. *National Electrical Manufacturers Association v. Gulf Underwriters Insurance Company,* 162 F.3d 821, 824 (4th Cir.1998) (applying District of Columbia law).

■ While not disputing Smith's testimony, the Intervenors contend that the Insurers have mischaracterized the "expected or intended" defense, which, according to the Intervenors, focuses on whether the insured's actions were intentional as opposed to accidental. The Court agrees. As the Maryland Court of Appeals has noted, "before the insurer may disclaim liability [under the "expected" clause], it must be shown that the insured intended by his act to produce the damage which did occur." *Allstate Ins. Co. v. Sparks*, 63 Md.App. 738, 493 A.2d 1110, 1112 (1985) (quoting *Eisenman v. Hornberger*, 438 Pa. 46, 264 A.2d 673, 674 (1970)). The focus, in other words, is upon what the insured actually intended at the time the insured committed the allegedly tortious act, not what the insured knew, should have known or actually came to know after the act was committed. *See also USF & G v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926, 932 (1991) (holding that it was not enough that the insured intentionally installed asbestos; the insured must have actually intended or expected the resulting damage in order for recovery to be excluded).

The Intervenors argue that, if this were not the standard, the whole idea of purchasing liability insurance would be defeated. Such insurance is purchased precisely in order to protect against certain types of claim that can be anticipated in certain business operations. To interpret "expected or intended" as suggested by Granite State and New Hampshire would effectively deprive companies of coverage for the types of claims that they know from their past operations might arise in the future.

The Court agrees. In ruling on the "expected and intended" defense during arguments on the duty to defend, the Court rejected the defense for these very reasons and does so again with regard to the matter of indemnification. Nothing in the record suggests that Wallace & Gale subjectively expected or intended to produce bodily injuries *while it was installing the asbestos-related materials*. The fact that, at some later time, it may have become aware that individuals had been exposed to the asbestos, that others might be developing complications or that others were manifesting symptoms, is irrelevant. Similarly, it is of no consequence that Wallace & Gale's former president, prior to 1984, may have known that asbestos-related bodily injury claims had been or might be filed thereafter. The Court joins innumerable other courts in holding to this view.[21]

■ Although Granite State and New Hampshire do not distinguish the "expected or intended" provision and the "known loss" doctrine, the Intervenors also point out that the Insurers cite several cases discussing the latter rather than the former. The "known loss" doctrine requires that the insurer prove that the insured actually knew of the specific loss for which coverage is sought before the policy was issued. *See Montrose*, 42 Cal.Rptr.2d 324, 913 P.2d at 904 (stating that " 'known loss' is a 'loss' [which] is 'known or apparent' before a policy of insurance is issued"). Where there is any uncertainty about the insured's liability for a specific claim and where no legal obligation to pay has been imposed upon the insured prior to the issuance of the policy, the "known loss" defense is not available to defeat coverage. *See id.* at 42 Cal.Rptr.2d 324,

---

**21.** *See, e.g., Sparks,* 493 A.2d at 1112; *Wilkin Insulation,* 161 Ill.Dec. 280, 578 N.E.2d at

929.

913 P.2d at 906; *see also Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.,* 124 F.3d 508, 518 (3rd Cir.1997) (holding that "the known loss doctrine will bar coverage only when the legal liability of the insured is a certainty").

Again, it is clear from this record that none of the Intervenors in this case made claims against Wallace & Gale prior to the issuance of the Granite State and New Hampshire policies. Moreover the Insurers have failed to establish that Wallace & Gale knew of any other specifically identifiable claims that had been made or were certain to be made at of the time they purchased the policies. As with the "expected or intended" defense, the fact that Wallace & Gale might have anticipated or expected general types of asbestos-related claims has no bearing.

None of the cases to which the Insurers cite is to the contrary. They only confirm the requirement that the insured specifically knew of a claim at the time the policy is purchased before the known loss defense will apply to defeat coverage. *See, e.g., Bartholomew v. Appalachian Ins. Co.,* 655 F.2d 27 (1st Cir.1981).

Granite State and New Hampshire's Motion for Summary Judgment as to their duty to indemnify asbestos bodily injury claims will be DENIED.

IX.

A separate order will be entered implementing this decision.

APPENDIX "A"
**WALLACE & GALE INSURANCE COVERAGE**

*PRIMARY POLICIES*

| Insurer | Dates of Coverage | Aggregate limit for operations/negligence claims | Aggregate limit for products/completed operations claims |
|---|---|---|---|
| Aetna Casualty & Surety (n/k/a Travelers Surety & Casualty Co.)("Travelers") | 1/1/62—1/1/63 | None | minimum of $25,000 |
| Travelers | 1/1/63—1/1/64 | None | minimum of $25,000 |
| Travelers | 1/1/64—1/1/65 | None | minimum of $25,000 |
| Travelers | 1/1/65—1/1/66 | None | minimum of $25,000 |
| Travelers | 1/1/66—1/1/67 | None | $1,000,000 |
| Travelers | 1/1/67—1/1/68 | None | $1,000,000 |
| Travelers | 1/1/68—1/1/69 | None | $1,000,000 |
| Travelers | 1/1/69—1/1/70 | None | $1,000,000 |
| Travelers | 1/1/70—1/1/71 | None | $1,000,000 |
| Travelers | 1/1/71—1/1/72 | None | $1,000,000 |
| Travelers | 1/1/72—1/1/73 | None | $1,000,000 |
| Travelers | 1/1/73—1/1/74 | None | $1,000,000 |
| Travelers | 1/1/74—1/1/75 | None | $1,000,000 |
| Travelers | 1/1/75—1/1/76 | None | $1,000,000 |
| Travelers | 1/1/76—1/1/77 | None | $1,000,000 |
| Travelers | 1/1/77—1/1/78 | None | $1,000,000 |

| Insurer | Dates of Coverage | Aggregate limit for operations/negligence claims | Aggregate limit for products/completed operations claims |
|---|---|---|---|
| Travelers | 1/1/78—1/1/79 | None | $1,000,000 |
| Travelers | 1/1/79—1/1/80 | None | $1,000,000 [1] |
| Hartford Ins. Co. | 1/1/80—1/1/81 | None | $ 500,000 |
| Hartford Ins. Co. | 1/1/81—1/1/82 | None | $ 500,000 |
| St. Paul Fire & Marine Ins. Co. | 1/1/82 –1/1/83 | None | $1,000,000 |
| St. Paul Fire & Marine Ins. Co. | 1/1/83—4/1/83 | None | $1,000,000 |
| Granite State Ins. Co. | 9/30/84—1/24/85 | $500,000 [2] | $ 500,000 |

1. The declarations page of this policy actually states the aggregate for products and completed operations claims as ",000,000." The Court assumes this is a typographical error and that Travelers meant to indicate a $1,000,000 aggregate limit for products and completed operations. However, if this is not a typographical error, then there would be *no* aggregate for products and completed operations claims for this policy year.

2. The Granite State policy is different from all the other policies listed in one respect. The Granite State policy, unlike the other policies, establishes an aggregate limit amount for *all* types of claims, including operations/negligence claims.

### EXCESS POLICIES [1]

| Insurer | Dates of Coverage | Aggregate limit for operations/negligence claims | Aggregate limit for products/completed operations claims |
|---|---|---|---|
| Continental Casualty Co. | 1/1/80—1/1/81 | $1,000,000 | $1,000,000 [2] |
| Riunione Adriatica Di Si-curta ("Adriatica") | 1/1/81—1/1/82 | None | $ 500,000 [3] |
| St. Paul Fire & Marine Ins. Co. | 1/1/82—1/1/83 | None | $3,000,000 |
| St. Paul Fire & Marine Ins. Co. | 1/1/83—4/1/83 | None | $3,000,000 |
| New Hampshire Ins. Co. | 9/30/84—1/25/85 | $1,000,000 [4] | $1,000,000 [4] |

1. Each excess policy provides coverage up to any applicable limits specified in the policy, subject to the exhaustion of any underlying primary policy or policies.

2. Continental's policy coverage is subject to a $1,000,000 aggregate regardless of the number or type of asbestos injuries asserted against it. The policy provides coverage to the total limit for the cost of defense and indemnity combined.

3. The Adriatica policy limit is altered where the underlying policy lists an aggregate for a given coverage. The Hartford 1981 primary policy lists an aggregate of $500,000 for products/completed operations claims.

4. The New Hampshire policy limit is also altered where the underlying policy lists an aggregate for coverage. The 1984–85 Granite State primary policy lists an aggregate of $500,000 for all claims, whether related to on-going or completed operations. According to the terms of the New Hampshire policy, its aggregate of $1,000,000 would then apply to all claims against the insured.

## APPENDIX "B"

### STIPULATION CONCERNING MEDICAL ISSUES

The Intervenors and The Travelers Casualty and Surety Company, formerly known as the Aetna Casualty and Surety Company, hereby stipulate, for the purpose of this case only, as follows:

1. Bodily injury and disease caused by asbestos, including asbestos-caused cancers and noncancerous asbestos-caused

diseases, are the result of a cumulative process that begins immediately upon initial inhalation of asbestos fibers, continues while the asbestos fibers remain in residence inside the body and continues through the manifestation of the asbestos-related disease.

2. Asbestos fibers, once they have been deposited within tissue, continue to cause injury for many years because the fibers are chemically stable and because many forms of asbestos-caused injury such as scarring of tissue and genetic damage to individual cells are permanent.

3. The progression of asbestos-caused disease involves some additional bodily injury in each year from the time of first exposure through the time a disease manifests in the body, but the precise amount of injury that occurs in each year cannot be proved.

4. The amount of bodily injury or disease that any person sustains during any given year is not necessarily equal and is variable depending on a variety of factors including but not limited to: 1) the extent and number of the person's exposures during that year; 2) the cumulative effect of prior exposures; and 3) that person's own unique physiology.

5. This stipulation is based upon the record that exists in this case and upon negotiations among the parties concerning disputed issues. This stipulation shall have no precedential effect in any other case and shall not be admissible to prove or disprove the contentions of any party in any other matter.

### APPENDIX "C"

### STIPULATION REGARDING VARIOUS ISSUES, DEFENSES AND DAMAGES

It is hereby stipulated between and among Travelers Casualty and Surety Company (formerly known as Aetna Casualty and Surety Company), Hartford Insurance Company, St. Paul Fire & Marine Insurance Company, Granite State Insurance Company and New Hampshire Insurance Company (the "Insurers"), and Intervenors Roy E. Jones; Andrew R. Youngbar; Louise Holcomb, Personal Representative of the Estate of Cossie Holcomb; and Robert M. Barber, Personal Representative of the Estate of Milton Barber (the "Intervenors") as follows:

In this declaratory judgment action, the Intervenors need not prove facts relating to the amount of damages to which each may be entitled as a result of his asbestos-related physical injury. The Insurers will not assert the potential defense that the Intervenors must prove the precise amount of bodily injury or damage that occurs in a given policy year to recover under the policies. The Insurers and Intervenors further agree that limits and allocation issues are justiciable without the Intervenors proving the probable value of their asbestos bodily injury claims. Accordingly, the Intervenors need not offer expert medical testimony regarding the physical condition of any of the Intervenors. Except as set forth above or in other stipulations and agreements entered into between the Insurers (or any of them) and the Intervenors, the Insurers reserve all of their defenses, including the defense that their policies may not provide coverage to individual claimants whose asbestos-related disease manifested before the inception of their policies. This stipulation is based upon the record that exists in this case and upon negotiations between the Insurers and Intervenors concerning disputed issues. This stipulation shall have no precedential effect in any other case and shall not be admissible to prove or disprove the contentions of any other matter.

APPENDIX "D"

### PLAINTIFF TRAVELERS CASUALTY AND SURETY COMPANY'S STIPULATION REGARDING VARIOUS DEFENSES

It is hereby stipulated between and among The Travelers Casualty and Surety Company, formerly known as the Aetna Casualty and Surety Company, ("Travelers") and Intervenors Roy E. Jones; Andrew R. Youngbar; Louise Holcomb, Personal Representative of the Estate of Cossie Holcomb; and Robert M. Barber, Personal Representative of the Estate of Milton Barber ("Intervenors") as follows:

1. Travelers will not contend, assert, defend or argue that the Wallace & Gale Company "expected or intended" the damages alleged by individuals asserting asbestos-related injury claims.

2. Travelers will not contend, assert, defend or argue that The Wallace & Gale Company's insurance coverage is barred, limited, excluded or impaired because an individual's asbestos-related injury constituted a "known loss" or a "loss in progress"; provided, however, that Travelers does not waive its rights to argue that its policies cannot be triggered once an individual's asbestos-related injury has manifested itself under applicable law.

### STIPULATION REGARDING VARIOUS DEFENSES BETWEEN HARTFORD AND INTERVENORS

It is hereby stipulated between and among Hartford Accident and Indemnity Company ("Hartford") and Intervenors Roy E. Jones; Andrew R. Youngbar; Louise Holcomb, Personal Representative of the Estate of Cossie Holcomb; and Robert M. Barber, Personal Representative of the Estate of Milton Barber ("Intervenors") as follows:

1. Hartford will not contend, assert, defend or argue that The Wallace & Gale Company "expected or intended" the damages alleged by individuals asserting asbestos-related bodily injury claims.

2. Hartford will not contend, assert, defend or argue that The Wallace & Gale Company's insurance coverage is barred, limited, excluded or impaired because an individual's asbestos-related injury constituted a "known loss" or a "loss in progress"; provided, however, that Hartford does not waive its rights to argue that its policies cannot be triggered once an individual's asbestos-related injury has manifested itself under applicable law.

3. Hartford will not contend, assert, defend or argue that any "pollution exclusion" clause of any insurance policy issued by Hartford to The Wallace & Gale Company bars, potentially bars, limits, excludes or impairs coverage for any asbestos-related bodily injury claims filed against The Wallace & Gale Company.

### ST. PAUL STIPULATION REGARDING VARIOUS DEFENSES

It is hereby stipulated between St. Paul Fire and Marine Insurance Company ("St. Paul") and Intervenors Roy E. Jones; Andrew R. Youngbar; Louise Holcomb, Personal Representative of the Estate of Cossie Holcomb; and Robert M. Barber, Personal Representative of the Estate of Milton Barber ("Intervenors") as follows:

1. St. Paul will not contend, assert, defend or argue that The Wallace & Gale Company "expected or intended" the damages alleged by individuals asserting asbestos-related bodily injury claims.

2. St. Paul will not contend, assert, defend or argue that The Wallace & Gale Company's insurance coverage is barred, limited, excluded or impaired because an

individual's asbestos-related injury constituted a "known loss" or a "loss in progress"; provided, however, that St. Paul does not waive its rights to argue that its policies cannot be triggered once an individual's asbestos-related injury has manifested itself under applicable law.

3. St. Paul will not contend, assert, defend or argue that any "pollution exclusion" clause of any insurance policy issued by St. Paul to The Wallace & Gale Company bars, potentially bars, limits, excludes or impairs coverage for any asbestos-related bodily injury claims filed against The Wallace & Gale Company.

## ORDER

Upon consideration of various pending motions in the captioned case, it is for the reasons set forth in the accompanying Opinion this 20th day of February, 2002

ORDERED:

1) The Intervenors' Motion for Summary Judgment (Paper # 271) is GRANTED IN PART and DENIED IN PART;

2) Travelers' Motion for Summary Judgment Concerning the Allocation and Aggregate Issues (Paper # 281) is GRANTED IN PART and DENIED IN PART;

3) Travelers' Motion for Summary Judgment Concerning the 1962–65 Policies (Paper # 280) is DENIED;

4) Summary judgment is GRANTED by the Court *sua sponte* in favor of the Intervenors concerning Travelers' 1962–65 policies, but only as to (a) the loss of the policies; (b) the terms and conditions of the policies; and (c) coverage of $5,000 per person and $10,000 per accident with no aggregate for general liability bodily injury claims, and $5,000 per accident and a $25,000 aggregate for products and completed operation claims;

5) Hartford's Cross–Motion for Partial Summary Judgment Concerning the Products/Completed Operations Hazard Aggregate Limit (Paper # 279) is GRANTED;

6) Granite State and New Hampshire's Motion for Summary Judgment (Paper # 277) is DENIED.

And it is further ADJUDGED, ORDERED and DECLARED as follows:

7) Each primary insurer in these proceedings shall be fully responsible, up to the limits of its policies, for all sums Wallace & Gale shall be found liable to pay for asbestos-related bodily injury claims;

8) Damages arising from the claims described in the foregoing Paragraph shall not be pro-rated among the Insurers. Consequently there shall be no allocation to Wallace & Gale for any period in which it was not insured against such claims;

9) Policies in effect in whole or part while Wallace & Gale was engaged in installing asbestos-containing materials shall not be subject to aggregate limits as set forth in the policies;

10) Policies in effect wholly after Wallace & Gale completed installing asbestos-containing materials shall be subject to aggregate limits as set forth in the policies;

11) Wallace & Gale shall not be subject to an "expected or intended" or "known loss" defense by any insurer.